Nagy KHAIRALLAH, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–132C.

United States Court of Federal Claims.

Feb. 26, 1999.

Anthony G. Talarico and Beverly M. Wurth, Lyndhurst, New Jersey, for plaintiff.

Sean H. Lane, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Jeanne M. Davidson, all of the U.S. Department of Justice, Washington, D.C. Vicki Curcio, Drug Enforcement Administration, of counsel.

## OPINION

BRUGGINK, Judge.

Plaintiff in this action, Nagy Khairallah, alleges that he contracted with the United States, acting through the United States Department of Justice Drug Enforcement Administration (DEA), to provide services as a confidential informant in exchange for twenty five percent of the value of assets seized as the result of that information. Pending is defendant's renewed motion for summary judgment.[1] The matter was transferred to this judge on December 10, 1998. It is fully briefed and oral argument is deemed unnecessary. For the reasons set forth below, defendant's motion is granted.

## BACKGROUND

The following facts are drawn from plaintiff's proposed findings of uncontroverted fact[2] which are supported in turn by his numerous affidavits and his deposition, and from defendant's affidavits, to the extent they are uncontested. Defendant's acquiescence to plaintiff's statement of facts is for the sole purpose of determining whether there is credible evidence that any of the DEA individuals with whom plaintiff dealt had authority to bind the government in contract, or whether any authorized individual ratified the alleged agreement. Such a determination is paramount to resolving the ultimate legal issue involved here—whether an enforceable contract existed between plaintiff and the DEA.[3]

Plaintiff was born in Lebanon on September 18, 1955, and has been a citizen of the United States since 1984. From 1980 to 1983, plaintiff worked as a confidential informant with the Royal Canadian Mounted Police (Mounted Police). In 1983, the Mounted Police was engaged in a joint operation with the United States. During this joint effort, plaintiff came into contact with DEA agents in Toronto, Canada, and in July 1983, began working as a confidential informant on various DEA investigations.

In late 1983, plaintiff entered into an arrangement with Harry Hansel. Group Supervisor for the DEA's Detroit, Michigan, office. Hansel and plaintiff agreed that the DEA would pay plaintiff's expenses, plus $5,000 for each kilogram of heroin seized. In addition, plaintiff would receive $100 a day and rewards of twenty five percent of the value of assets recovered. Plaintiff began working in Detroit and was consistently paid in accordance with this arrangement.

In March or April 1984, while working in Puerto Rico, plaintiff met DEA agents William Kean, field agent, and Frank Panessa, either Group Supervisor or Assistant Special Agent in Charge, both from the New York Field Division Office. Upon the DEA's request, plaintiff went to work for the DEA in New York. Kean told plaintiff that the DEA would pay plaintiff a salary of $3,100 per month plus $1,000 per week for expenses.[4]

1. The United States previously filed a motion to dismiss, which was granted in part and denied in part, and a motion for summary judgment, which was denied without prejudice.

2. Although plaintiff did not cross move for summary judgment, he submitted proposed findings of fact in response to defendant's motion.

3. See *Cienega Gardens v. United States*, 162 F.3d 1123 (Fed.Cir.1998) ("Whether a contract exists is a mixed question of law and fact."); *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed.Cir.1993) (contract interpretation is a matter of law); *Blake Constr. Co. v. U.S.*, 987 F.2d 743, 746 (Fed.Cir.1993).

4. In one paragraph of his proposed findings, plaintiff alleges that the DEA agreed to pay plaintiff $3,100 per month salary and $1,000 per week for expenses, but in another paragraph, he alleges that his agreement with Kean involved a per diem of $100 per day. In any event, the compensation amount in both paragraphs is in addition to a reward of twenty five percent of the value of the assets seized. This inconsistency, therefore, is immaterial to the issue at hand because only the twenty five percent of the value of assets seized is in dispute.

Additionally, the DEA would reimburse plaintiff for extraordinary expenses such as travel costs, unusually high phone bills, and costs associated with entertainment of various targets. The agents agreed that plaintiff would receive twenty five percent of all cash seized by the United States resulting from the cases in which plaintiff was involved. In addition, the DEA would pay plaintiff $5,000 per kilogram of heroin seized and $1,000 per kilogram of cocaine seized. Plaintiff agreed and immediately began working for the New York Field Division.

Plaintiff's agreement with the DEA was again reaffirmed in 1985 by Jack McCreedy, Assistant Special Agent in Charge of the New York Field Division. Supervision of plaintiff was later moved to Group Supervisor James Kibble's New York Field Division Group 34. Kibble reaffirmed plaintiff's agreement with the DEA. In 1989, plaintiff moved to DEA Group 32 under the supervision of Group Supervisor Gloria Woods who also reaffirmed the agreement.

In 1987, plaintiff worked on an investigation of Sholomo Cohen which resulted in the seizure of five pounds of cocaine and $53,-000.[5] Plaintiff did not receive a reward from this seizure. Also in 1987, plaintiff worked on an investigation of Sami Ibrahimi which resulted in the seizure of one pound of cocaine and $73,000.[6] Again, plaintiff did not receive a reward from this seizure. In 1988, plaintiff worked on the investigation of Joseph Mancini which resulted in the seizure of 113 pounds of cocaine and $480,000.[7] Plaintiff received a ten percent reward from this seizure. Plaintiff claims that the DEA refused to reward plaintiff in the Cohen and Ibrahimi cases and rewarded plaintiff only ten percent in the Mancini seizure because of plaintiff's participation in an internal investigation of DEA Group 32 in 1987.

Plaintiff continued working full time for the DEA as a confidential informant until he was deactivated in 1991, when he pled guilty to one count of perjury relating to testimony regarding his failure to declare the compensation received from the DEA on his tax returns. Plaintiff's perjury violated a "Cooperating Individual Agreement"[8] he had signed in 1987 in which he agreed not to "violate criminal laws in furtherance of gathering information or providing services to DEA...."

Defendant does not dispute that plaintiff worked on numerous cases up until his deactivation in 1991, and that, with the exception of the three cases that form the basis of this action, the DEA always paid plaintiff in the way he asserts. Beginning in 1991, plaintiff began submitting written requests to the DEA for twenty five percent of the value of the assets seized in the Cohen and Ibrahimi investigations and an additional 15 percent of the value of the assets seized in the Mancini investigation. In his correspondence, plaintiff stated that his requests were "in accordance with Public Law 98–473," which apparently refers to Act of Oct. 12, 1984, Pub.L. No. 98–473, 98 Stat.1984, now codified at 28 U.S.C. § 524 (1994) (hereafter "Section 524"). Plaintiff consistently framed his administrative requests for payment in terms of Section 524. The DEA denied the requests on the ground that plaintiff had already been adequately compensated for his participation in those investigations and that further rewards under Section 524(c) would not be forthcoming.

## PROCEDURAL HISTORY

Plaintiff filed the instant complaint on March 5, 1993. Count I alleges that defendant breached a contract with plaintiff. Plaintiff adds that such a contract would be authorized pursuant to Section 524. Count

---

5. Defendant claims the total value of assets seized in the Cohen case was $51,000.

6. Defendant claims the total value of assets seized in the Ibrahimi case was $64,000.

7. Defendant claims the total value of assets seized in the Mancini case was $423,750.

8. The Cooperating Individual Agreement merely states that: plaintiff will not violate any laws in furtherance of his work for the DEA; the Cooperating Individual has no official status with the DEA; the Cooperating Individual may be called upon to testify and that his confidentiality can not be guaranteed; and it is a Federal offense for the DEA to threaten or harass a Cooperating Individual. No promises are made by the DEA.

II alleges breach of contract and unjust enrichment. Count III alleges that defendant's failure to make payments to plaintiff constitutes a deprivation of plaintiff's liberty and property rights under the Fourteenth Amendment to the Constitution in violation of 42 U.S.C. § 1983 (1994). Defendant moved to dismiss all three counts pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. In a September 14, 1993, order, Judge Andewelt, to whom this case was previously assigned, granted defendant's motion to dismiss Count III and that portion of Count II that was not based on a breach of contract theory. See *Khairallah v. United States*, No. 93–132C, slip op. at 3 (Fed.Cl. Sep. 14, 1993). He further ruled that jurisdiction did not exist for any claim founded on Section 524 as that statute leaves reward payments to the discretion of the Attorney General and is therefore not money mandating within the meaning of the Tucker Act, 28 U.S.C. § 1491. He denied the motion to dismiss in other respects.

On November 3, 1993, defendant filed its first motion for summary judgment on the breach contract claims. The court denied defendant's motion without prejudice, however, for the following reasons:

Defendant apparently brought its summary judgment motion prematurely. Defendant first should have conducted discovery to determine the factual basis underlying plaintiff's allegation that a binding contract exists, *i.e.*, to determine precisely with whom plaintiff allegedly entered the agreement and who within the DEA allegedly ratified the agreement. By so limiting plaintiff's contentions, defendant then, if appropriate, could have sought to demonstrate through the presentation of affidavits that the DEA employees upon whom plaintiff's contract claim relies did not have the requisite authority to bind the government in contract. Because defendant's motion and accompanying affidavits do not demonstrate the absence of any dispute as to a material issue of fact, defendant's motion for summary judgment must be denied.

*Khairallah v. United States*, No. 93–132C, slip op. at 2–3 (Fed.Cl. June 9, 1994).

Defendant thereafter deposed plaintiff and identified the individuals who allegedly had agreed that plaintiff would receive twenty five percent of the value of the assets seized. Defendant then renewed its motion for summary judgment, asserting that no one with whom plaintiff had any direct contact had authority to enter into the type of contract plaintiff alleges, or, alternatively, that no one with sufficient contracting authority ever either ratified the necessary contract terms.

In his first brief in opposition to defendant's second motion for summary judgment, plaintiff presents two theories to support the conclusion that a contract existed between plaintiff and the DEA. First, plaintiff claims that he entered into an express contract with DEA agents Harry Hansel, Bruce Bryda, Fred Sandler, Kenneth Feldman, Michael Grabowski, Julio Mercado, John Traylor, William Kean, Frank Panessa, Jack McCreedy, James Kibble, and Gloria Woods, all of whom plaintiff asserts had been delegated contracting authority. In the alternative, plaintiff claims that even if these agents had not been granted contracting authority, their agreement with plaintiff was later ratified by Robert A. Bryden, Special Agent in Charge, and/or John Coleman, Assistant Administrator for Operations. Plaintiff claims that both Bryden and Coleman were aware that a contract existed between the DEA and plaintiff and tacitly, if not explicitly, approved payments to plaintiff with the understanding that they were being made pursuant to a contract.

In response, defendant presents the affidavit of James M. Whetstone, Deputy Assistant Administrator for the Office of Acquisition Management of the DEA, who supervises all contract activities for DEA Headquarters and all DEA field offices. Whetstone states that a delegation of procurement authority from either Whetstone or his predecessors is required for a DEA employee to enter into a contract with any non-government contractor, vendor, or other individual. None of the agents with whom plaintiff alleged he negotiated had ever been delegated procurement authority.

In a July 17, 1997 order, this court ruled that Whetstone's affidavit was sufficient to demonstrate the absence of any genuine issue as to whether the DEA agents with whom plaintiff interacted had express contracting authority. Plaintiff thus had failed to meet his burden of presenting sufficient evidence that the DEA had expressly delegated contracting authority to one or more of these agents. The court deferred, however, entering final judgment pending additional briefing for two reasons. First, defendant had not addressed the issue of ratification until its reply brief, and thus plaintiff did not have an opportunity to respond in detail. Second, plaintiff, in his opposition brief, alleged ratification by Robert A. Bryden, Special Agent in Charge, and John Coleman, Assistant Administrator for Operations, and although defendant submitted a second Whetstone affidavit stating that Bryden had never been granted contracting authority, it did not address the contracting authority of Coleman. Consequently, Judge Andewelt ordered defendant to address whether Coleman had contracting authority and permitted plaintiff to brief his position on the issue of ratification.

In response to the July 17, 1997 order, defendant presented a third affidavit by Whetstone affirming that Coleman had never been granted contracting authority, and plaintiff filed a brief restating his assertion that Bryden and Coleman had ratified the arrangement. Additionally, in his supplemental brief and affidavit, plaintiff alleges for the first time that Dave Westrate, Assistant Administrator for Operations for the DEA in 1986, also knew of, and ratified, the arrangement.

## DISCUSSION

Although there has been some evolution to plaintiff's argument, what has remained consistent are the terms of the alleged agreement—namely, that plaintiff was to receive twenty five percent of the value of forfeitures. What are not at issue are asserted agreements to pay plaintiff a monthly retainer or to reimburse him for expenses. Regardless of how plaintiff chooses to characterize his agreement with the DEA, his claim fails due to a consistent deficiency—none of the agents with whom plaintiff had direct contact had any contracting authority, and although the individual most recently named, Westrate, may have some general contracting authority, as discussed below, there is insufficient evidence of ratification by him. Before addressing these defects in plaintiffs suit, the court will first recount the evolution of plaintiff's claim.

In his reply brief and affidavit, plaintiff clarifies that the alleged contract is not predicated on Section 524, even though its terms incorporate in substance the remedy offered by that provision and his administrative appeals were based on that provision. The need for plaintiff to make this distinction is clear. The court has previously ruled that Section 524 cannot form the basis for a claim in this court because it is not "money mandating" but rather involves rewards that are totally discretionary.[9]

Section 524 authorizes a reward for "information and assistance," determined as an exercise of discretion after the fact of seizure. The relevant language provides:

(c)(1) There is established in the United States Treasury a special fund to be known as the Department of Justice Assets Forfeiture Fund (hereafter in this subsection referred to as the "Fund") which shall be available to the Attorney General without fiscal year limitation for the following law enforcement purposes—

. . .

(C) at the discretion of the Attorney General, the payments of awards for information or assistance leading to a civil or

9. Because Section 524 leaves the payment of money to the discretion of the Attorney General, it is not money mandating and cannot itself provide a jurisdictional basis for a claim in this court. *See Hoch v. United States,* 33 Fed.Cl. 39, 44 (1995) (Section 524 not money mandating); *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) ("entitlement to money damages depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal government for the damage sustained' ") (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967)).

criminal forfeiture involving any Federal Agency participating in the Fund . . .

28 U.S.C. § 524(c)(1)(C).

By their very nature, evaluations of the utility of information or assistance leading to a forfeiture for the purpose of determining whether to make an award cannot take place until after the forfeiture is complete. This becomes more apparent from the way in which Section 524 is implemented, as explained in the declaration of Harold D. Wankel, Deputy Assistant Administrator for the DEA. Wankel states that awards under Section 524(c) are paid from the Assets Forfeiture Fund at the discretion of the Attorney General, or her delegate, and that this authority has been delegated to the Administrator of the DEA and the Deputy Assistant Administrator for Operations. *See* Section 524(c)(1)(C). As described in Wankel's declaration:

The DEA has established a procedure by which Special Agents of DEA may request award payments from the Assets Forfeiture Fund under 28 U.S.C. § 524(c) on behalf of cooperating individuals. The procedure appears in the DEA Agents Manual and is the only means for obtaining an award authorized by U.S.C. § 524(c). The procedure is initiated by the submission of a memorandum, or appropriate DEA form, from the Special Agent–in–Charge of the requesting field office of DEA. This memorandum sets forth relevant information pertaining to the award request, including the extent and significance of the cooperation. The memorandum recommends an amount of award no greater than one-fourth of the net amount realized by the United States from the drug-related forfeitures, or a dollar amount up to $250,000. The request is then forwarded to my office [Deputy Assistant Administrator for Operations] in DEA Headquarters, Washington, D.C., and is logged in once received. If the request is pursuant to 28 U.S.C. § 524(c)(1)(C), it is forwarded to the DEA Asset Forfeiture section prior to approval to await the de-

termination of the net amount the United States will realize from the forfeiture of the drug-related assets. After the forfeitures and disposition of the assets is completed, the request is reviewed within my office for approval, denial, or modification. If the request is pursuant to 28 U.S.C. § 524(c)(1)(B), it is reviewed for approval, denial, or modification shortly after receipt by my office. Either type of award is funded after approval by the assignment of an appropriation number, or issuance of a government check (payable to the cooperating individual), which is then forwarded to the DEA field office for payment.

In sum, the wording of the statute and the regulations makes clear that what is contemplated is the exercise of discretion and that exercising that discretion occurs after the forfeiture. Agreeing in advance to a particular award would thus clearly be impermissible under Section 524 itself.

Plaintiff's answer to this is straightforward—I contracted to the same effect without relying on that section. This argument has the ring of improvisation. Throughout the administrative process, plaintiff consistently based his claim on Section 524. Correspondence from plaintiff to various DEA agents refers to money owed to plaintiff "under public law 98–471," the reward statute. Even plaintiff's present attorney, in correspondence with Westrate, claims that plaintiff's entitlement to twenty five percent of the assets seized is "[i]n accordance with P.L. 98–471."

Even ignoring this apparent inconsistency, Plaintiff's claim fails. If the court were to agree that a contract arose in which the agency was obligated to pay plaintiff a fixed percentage of forfeiture recoveries, the recovery would come either out of the Asset Forfeiture Fund or from general appropriations. In the former case, the payment would be in direct conflict with the payment scheme set forth in Section 524.[10] If the recovery were to come from general agency appropriations, then the question is whether any of the agents with whom plaintiff dealt

---

10. Additionally, plaintiff's claim would suffer from the fact that, as previously discussed, Section 524 is not money mandating and cannot,

therefore, provide a jurisdictional basis for a claim in this court.

had express contracting authority, and if not, whether authority to obligate agency funds can be implied under circumstances in which Congress has set up a specific device for rewarding informants. The court concludes the answer to both inquiries is no.

 Although for contracts between private parties it is sufficient to show that the agent had apparent authority to bind the principal, in suits against the United States, a party must show that the government agent had actual authority, either express or implied, to bind the United States. *See Cruz–Pagan v. United States*, 35 Fed.Cl. 59 (1996) (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)).[11] The court's previous rulings and the government's more recent submissions,[12] which are unrebutted, establish that none of the individuals plaintiff has mentioned had express contracting authority, with the possible exception of Dave Westrate, who will be discussed later.[13] Plaintiff alleges, however, that the individuals he has named were granted authority to contract for rewards by implication.

 Actual authority can be implied when such authority to bind the United States in contract is "an integral part of the duties assigned to a [g]overnment employee." *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed.Cir.1989). In determining

whether such implied authority might exist in these circumstances, it is important to recognize the precise nature of the alleged contract. The action does not concern a failure to pay expenses. The court will assume solely for the purposes of deciding defendant's motion for summary judgment that authority to pay expenses might be implied in field agents. The more focused question, given the limited nature of the claim here, is whether authority can be implied to promise a reward based on the outcome of the mission.

A related question was addressed in *Cruz–Pagan v. United States*, 35 Fed.Cl. 59, at 63 (1996). There, based on a review of affidavits and the pertinent provisions of the DEA Agents Manual, the court concluded that DEA field agents do not have implied actual authority to enter agreements because the grant of contracting authority is not integral to their duties. *See Cruz–Pagan*, 35 Fed.Cl. at 63. The court based its conclusion on the fact that the DEA has established procedures by which to secure the cooperation of confidential informants, evaluate the value of information received, and in turn compensate the informants fairly, without granting DEA field agents contracting authority. This procedure is set out in Section 524 and the DEA Agents Manual, as further explained by Wankel, above. Only express delegations of

---

11. The requirement that a government agent have actual authority extends to those alleged to have ratified a contract with a nongovernment entity as well. *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed.Cir.1998) ("Agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority...."); *Total Medical Management, Inc. v. United States*, 104 F.3d 1314, 1319 (Fed.Cir.1997) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract.").

12. Defendant has now presented three affidavits by Whetstone which, among other things, state that, to his knowledge, neither Bryden nor Coleman have ever been delegated procurement authority. · Plaintiff has presented no contrary evidence. Instead, plaintiff argues that defendant

should have presented an affidavit or certification of Coleman himself, or, in the alternative, produced "letters, memorandum or other documents that would indicate that Mr. Coleman had not ratified any agreements with Plaintiff." Plaintiff is mistaken. Defendant has met its burden of presenting evidence that neither Bryden nor Coleman had contracting authority. It is incumbent upon plaintiff to present contrary evidence. He has not done so.

13. The present facts are thus distinct from those in *Henke v. United States*, 43 Fed.Cl. 15 (Fed.Cl. 1999), where some of the lower-level officials with whom Henke dealt did in fact have limited contracting authority. The court assumed that those officials could have contracted for payments from sources other than the Asset Forfeiture Fund. *See Henke*, at 21. There is no evidence that the officials here had *any* contracting authority, and, in any event, there is no request for payment of expenses or other non-reward type payments.

authority, in other words, could authorize an agent to enter into a contract.

A similar analysis was applied in *Roy v. United States*, 38 Fed.Cl. 184, 189–90 (1997), where the court applied *Cruz–Pagan's* implied authority analysis to FBI agents. The existence of a payment mechanism for securing the cooperation of confidential informants was held sufficient to demonstrate an absence of implied authority in FBI agents to contract.

One other reason exists to imply a limitation on an agent's authority to contract. As explained in *Henke v. United States*, 43 Fed. Cl. 15 (1999), the DEA, like all federal agencies, delegates specific grants of procurement authority up to specific amounts. *See Henke*, at 18–19. The ability to promise a reward of an unknown amount—the precise authority needed here—is inherently at odds with such limitations. The success of a mission cannot be known with certainty before the mission takes place. The notion that DEA employees could contract in such a way so as to bind the agency to honor open-ended promises is thus not only inconsistent with the scheme set up by Section 524, but also would thwart the orderly delegation of limited authority.

██ The court's reasoning in this regard eliminates the possibility of either express or implied authority for anyone other than the individual plaintiff has presented in his most recent brief, Dave Westrate, Assistant Administrator for Operations for DEA. Plaintiff asserts that in 1986 he was advised by Jack McCreedy, Assistant Special Agent in Charge, that Westrate "interceded on his behalf to ensure that Plaintiff's contracts

were honored and that he would be paid." [14] In addition, plaintiff recites that Westrate called the Special Agent in Charge (SAC) of the New York Field Office and "told him to expedite the paperwork to make sure [plaintiff] would get paid" for work plaintiff had done in the Kassemakki case. From this, plaintiff argues first, that Westrate must have had authority to ratify the alleged agreement, and second, that this statement constitutes such ratification. [15]

Even if Westrate had the authority plaintiff attributes to him, plaintiff has not established the necessary elements of ratification. Ratification requires knowing acquiescence to an unauthorized agreement by a superior who has contracting authority. *See Henke*, at 26–27; *California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 27–28 (1990) (quoting *United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901)), *aff'd* 937 F.2d 624, 1991 WL 112816 (Fed.Cir. 1991) (table). In order to demonstrate ratification, and thereby prevail, plaintiff must produce evidence that Westrate acted in such a manner as to manifest "knowing acquiescence" to an agreement by which plaintiff, acting as a confidential informant, was guaranteed twenty five percent of the value of assets recovered from missions.

Plaintiff's argument fails. Westrate's alleged actions fall far short of those which would amount to a ratification of an agreement to pay a reward. Plaintiff's assertion demonstrates its own futility. "Intercession" necessarily implies a lack of authority, not approval. One intercedes on behalf of a petitioner to someone else who possesses the ultimate decision-making authority. [16] If Westrate had been ratifying an agreement,

---

14. As this allegation appears for the first time in plaintiff's supplemental brief, defendant has not had the opportunity to respond.

15. Dave Westrate is indeed the highest ranking official in the DEA of those individuals identified by plaintiff as possibly having ratified the alleged agreement. Although plaintiff offers no evidence that Westrate actually had contracting authority other than the statement that "Mr. Westrate at the time was second in charge of DEA operations throughout the United States," the court will assume that Westrate was sufficiently highly placed within the DEA to have some contracting authority.

16. Although Westrate may have had contracting authority, he did not have authority to grant rewards under Section 524. As previously stated, by statute, that authority is granted to the Attorney General or her delegees. *See* Section 524(c). By regulation, the Attorney General has only delegated that authority to the Administrator of the DEA and the Deputy Assistant Administrator for Operations. *See* 28 CFR § 0.101(d); Affidavit of Harold Wankel, Def. Motion to Dismiss of May 17, 1993, App. 1, p. 1.

"intercession" would have been unnecessary; he could have authorized the payments himself. "Intercession," on the other hand, would have been appropriate only if Westrate were seeking a discretionary reward for plaintiff pursuant to Section 524. Indeed, at the time of the alleged "ratification," plaintiff was asserting an entitlement based on Section 524. There is no reason to think that Westrate would have viewed the request any differently. The statement that Westrate told the SAC to expedite paperwork in connection with earlier missions to ensure that plaintiff would get paid is thus fully consistent with the discretionary payment of awards under Section 524 and is no evidence that Westrate was ratifying a contractual arrangement.

## CONCLUSION

For the reasons set forth above, defendant's renewed motion for summary judgment is granted. No agent with authority contracted to pay plaintiff a reward. The Clerk is directed to enter judgment dismissing the complaint with prejudice. No costs.