**Peder HUMLEN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–637C.**

United States Court of Federal Claims.

May 31, 2001.

Dave M. Barela, Diamond Bar, CA, for plaintiff.

Armando O. Bonilla, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom on the brief were Bryant G. Snee, Assistant Director, David M. Cohen, Director, and David W. Ogden, Assistant Attorney General; Natalia Leons, Federal Bureau of Investigation, Washington, D.C. and AnnMarie Highsmith, U.S. Customs Service, Long Beach, CA, of counsel.

## *OPINION*

MARGOLIS, Senior Judge.

This contract action is before the Court on defendant's motion for summary judgment pursuant to Rule 56 of the United States Court of Federal Claims ("RCFC"). Plain-

tiff, a former government informant, contends that he is entitled to relief because the government failed to compensate him according to the oral terms of his written contract. After carefully considering both parties' written and oral arguments, the Court concludes that plaintiff's claims for breach of contract, intentional denial of existence of contract, request for equitable accounting and declaratory relief, i.e., Counts I and IV–VI of the complaint, are *denied.* The government's motion for summary judgment is *granted.*[1]

### FACTS

In 1993, United States Customs Service ("USCS") Agent Michael F. O'Shaughnessy ("O'Shaughnessy") contacted the plaintiff, Peder Humlen, on numerous occasions regarding an ongoing investigation of Columbian cartel leader John Jairo Montoya's ("Montoya") drug trafficking activities.[2] At these meetings, O'Shaughnessy asked plaintiff to become a USCS confidential informant to assist in the arrest and conviction of Montoya. In exchange for plaintiff's services, O'Shaughnessy allegedly promised plaintiff 25% of any amounts of money or property recovered through his efforts, cooperation and assistance, and $500 per kilogram of cocaine seized by the USCS. Plaintiff agreed and on February 22, 1993, O'Shaughnessy formally requested authorization from the Special Agent–in–Charge, John Luksic, to name plaintiff as a USCS confidential informant. Plaintiff was approved as such on March 3, 1993.

The USCS paid plaintiff an initial $1,000 lump-sum for information on June 22, 1993, and a subsequent $5,000 lump-sum for information on January 27, 1994. In late 1993, plaintiff stopped providing information to the USCS and was officially "deactivated" as a USCS confidential informant on October 26, 1994.

1. On October 1, 1998, memorialized by order dated October 5, 1998, this Court granted the United States' motion to dismiss Counts II and III, fraud in the inducement and promissory estoppel, on jurisdictional grounds.

2. This was a joint criminal investigation between the USCS, the Santa Ana, California Field Offices

In early 1994, Federal Bureau of Investigation ("FBI") Special Agents Craig Howland ("Howland") and Ralph Hope ("Hope") sought plaintiff's assistance in a parallel FBI attempt to secure Montoya's conviction. Plaintiff was formally "opened" as an FBI cooperative witness and agreed to wear equipment to record conversations with the subjects of an FBI criminal investigation known as Steelwind.[3] Plaintiff alleges that Special Agents Hope and Howland promised to reimburse him for his reasonable expenses and compensate him up to $2,000 per month. Additionally, plaintiff claims that the FBI, through Special Agents Hope and Howland, promised to pay him 25% of any monies recovered from property or money forfeiture, $500 for every kilogram of cocaine seized, and a lump-sum award of up to $250,000 at the conclusion of the investigation. Although plaintiff claims that but for these alleged promises he would not have agreed to participate, he signed the equipment agreement in January 1994 with the following waiver: "I have given this written permission to the above named Special Agents [Hope and Howland] voluntarily, and without threats or promises of any kind."

Thereafter on January 20, 1994, plaintiff executed a "Non–Personal Services Agreement" (the "Agreement") with the FBI to formalize his status as a confidential informant. This agreement was reviewed by the FBI Contracts Unit at FBI Headquarters and signed by the FBI Supervisory Special Agent of the Chief Contracting Officer, James R. Dietz ("Dietz"), a duly authorized contracting officer. Under the terms of the Agreement, plaintiff would provide the FBI with information regarding Montoya's drug trafficking activities in exchange for a monthly compensation of, at most, $2000. Additionally,

> The FBI may, *at its sole option and choice,* elect to furnish Humlen with an award of money upon the completion of the

of the Federal Bureau of Investigation ("FBI") and the United States Drug Enforcement Administration ("DEA"), as well as various California state law enforcement agencies.

3. "Steelwind" was the FBI case name given to the Montoya investigation.

investigation. The amount of any award is at the *complete and total discretion* of the FBI and/or the Attorney General of the United States and, as stated in 28 U.S.C. § 524 [ (1994) ], any award for information or assistance leading to a civil or criminal forfeiture is at the complete and full discretion of the Attorney General and shall not exceed the lesser of $250,000 or one-fourth of the amount realized by the United States from the property forfeited.

Df. App. 311–12 ¶ 3 (emphasis added). In addressing the scope of the Agreement, the document expressly stated:

> This document constitutes the *full and complete agreement between Humlen and the FBI. Modifications to this agreement will have no force and effect unless and until such modifications are reduced to writing and signed by all parties thereto.*

Df. App. 313 ¶ 16 (emphasis added). The Agreement also provided that Special Agent Hope is the "designated representative for the FBI Contracting Officer." Df.App. 314.

Plaintiff asserts that when FBI Special Agents Rowland and/or Hope presented the Agreement for his signature, he asked the agents why the written contract differed from the oral promises they had made to him regarding the 25% reward, the $500 per kilogram of cocaine seized, and the "up to $250,000 lump-sum." In response, the agents allegedly explained that the Agreement had to be "couched" in that way because it was a discoverable document in any future criminal prosecution and thus could be used to discredit plaintiff's reliability and credibility. Plaintiff maintains that the agents assured him that despite the wording of the contract, he would receive 25% of all forfeited money and property, as well as $500 per kilogram of cocaine seized.

Based in part on information provided by plaintiff, Montoya was arrested and pleaded guilty on November 27, 1995 to Interstate Travel and Transportation in Aid of Racketeering Enterprise, among other charges. In addition, plaintiff claims his information led to the arrest of three of Montoya's colleagues, the seizure of 428 kilograms of cocaine, the seizure and eventual forfeiture of $754,000, a residence on Allesandro Street in Los Angeles, a Nissan pick-up truck, two Ford Aerostar vans, and a 1990 Blue Camaro.[4] He attributes the seizures to both the USCS and the FBI. The government, on the other hand, maintains that plaintiff's information supplied to the FBI in the Steelwind Investigation led to the arrest of Montoya's colleagues, and the seizure of over 230 kilograms of cocaine and approximately $50,000. Information provided to the USCS, however, did *not* result in any arrests, seizures and/or forfeitures of any money or property by the USCS.

During the course of the FBI Steelwind Investigation, plaintiff's handling agents changed due to transfer assignments. The chain of assignment began with Special Agent Howland who reassigned plaintiff to Special Agent Hope. When Special Agent Hope was transferred to another field office, plaintiff then was reassigned to Special Agent Norman Embry ("Embry") and then finally to Special Agent Lorena Sierra ("Sierra"). Plaintiff maintains that throughout the investigations, FBI Special Agents Rowland, Hope, Embry and Sierra[5] and USCS Agent O'Shaughnessy repeatedly assured him that he would receive his anticipated remuneration for continued cooperation in the investigative effort as Special Agents Hope and Howland originally promised.

From the time plaintiff executed the Agreement through the prosecutorial phase of the FBI Steelwind Investigation, the FBI remitted to plaintiff monthly payments of up to $2,000. Also in accordance with the Agreement, he was reimbursed for the reasonable expenses he incurred in furtherance of the criminal investigation and offered sponsorship into the United States Marshal Federal Witness Protection Program. Additionally, the DEA remitted to plaintiff a one-

---

4. There is some discrepancy between the plaintiff's complaint and his Opposition Motion as to the exact amount of money, property and cocaine seized.

5. Although not alleged in his complaint, in his deposition plaintiff stated that FBI Agent Sierra made similar compensation promises to him.

time lump-sum $5,000 payment to relocate himself and his family.

On January 25, 1996, Agent Sierra prepared a request for a final $2,000 payment to plaintiff and noted that "[t]his will be the final payment to the source from case funds; however, Sara 5 [6] is preparing a request for lump sum payment which will be forwarded via separate cover *for approval.*" Df. App. 508–09 (emphasis added). Supervising Special Agent Linas Danilevicius ("Danilevicius"), Assistant Special Agent–in–Charge Stephen Steinhauser ("Steinhauser") and Special Agent–in–Charge/Associate Special Agent–in–Charge, Ralph Girardi ("Girardi"), signed and approved the final payment request. On or about March 27, 1996, Agent Sierra prepared a formal request for a $50,000 one-time lump-sum award payment for plaintiff's "services" as a cooperative witness during the FBI Steelwind Investigation. Ultimately intended for review and possible approval by FBI Headquarters, Agent Sierra's request was forwarded to her immediate supervisor, Danilevicius and then to his immediate supervisor, Steinhauser. On April 10, 1996, Steinhauser returned the award request to Danilevicius with a note stating:

> Linas—the [cooperative witness] is credited with 232 kilos of coke, $50K cash seized, 3 arrests & convictions. For this, he has been paid $50,000 on a personal services agreement during 1/20/94 to 2/12/96. We are now asking for a lump sum of $50,000 for the same information & accomplishments for the same period of time! I must be missing something here!

> Please shed some light and provide justification; I have reviewed the file and I don't see it.

Df. App 432–33. No further action was taken on this request. Agent Sierra informed plaintiff that the requested $50,000 had been denied. On May 23, 1996, the FBI officially "closed" plaintiff as a cooperative witness.

In August 1996, plaintiff submitted a "Consolidated Government Claims" to both the USCS and the FBI alleging that the two Federal law enforcement agencies failed to honor certain compensation promises made to plaintiff for his services as a confidential informant/cooperative witness.[7] FBI Headquarters denied his claim for additional compensation on September 24, 1996, and the United States Department of the Treasury denied his claim for additional compensation from the USCS on September 26, 1996.

On September 23, 1997, plaintiff brought action in this Court seeking to enforce the compensation promises allegedly made to him by USCS Special Agent O'Shaughnessy and FBI Special Agents Howland, Hope, Embry and Sierra.[8] He is alleging five counts: (I) breach of contract; (II) fraud in the inducement; (III) promissory estoppel; (IV) intentional denial of existence of contract; (V) request for equitable accounting; and (V) declaratory relief. On October 1, 1998, this Court granted-in-part and denied-in-part the United States' motion to dismiss Counts II through VI. *See Humlen v. United States,* No. 97–637 C (October 5, 1998 order memorializing October 1, 1998 bench ruling). Specifically, the Court dismissed Counts II and III, fraud in the inducement and promissory estoppel, on jurisdictional grounds. *See Humlen v. United States,* No. 97–637 C (October 5, 1998 order memorializing October 1, 1998 bench ruling). Thus, before this Court is defendant's motion for summary judgment upon the remaining counts of plaintiff's complaint, Counts I and IV–VI, on the grounds that there are no genuine issues of material fact in dispute and that the Government is entitled to judgment as a matter of law.

### DISCUSSION

**I. Breach of Contract Claim Against the FBI**

Plaintiff's breach of contract claim against the FBI rests on the premise that the ex-

---

**6.** "Sara 5" is the name given to the group of FBI Agents who worked on this case.

**7.** The USCS classified plaintiff as a "confidential informant" and the FBI classified him as a "cooperative witness."

**8.** As mentioned above, after the complaint was filed, plaintiff included FBI Special Agent Sierra in his allegations.

press terms of compensation contained in the parties' January 1994 Agreement do not accurately reflect the alleged financial promises verbally made to him by FBI Special Agent Hope at the time the parties executed the written document. Plaintiff breaks the umbrella breach of contract claim into: (1) a breach of an oral contract between plaintiff and Agents Howland, Hope, Embry and Sierra and/or, (2) in the alternative, a reformation of the written document to include the alleged contemporaneous and continuous verbal promises made by Agents Howland, Hope, Embry and Sierra; and/or (3) breach of the express written Agreement.

### A. Plaintiff's Claims of an Oral Contract With the FBI Are Unenforceable As A Matter of Law

In ruling upon the Government's motion for summary judgment, the Court need not decide the factual question of whether Agents Howland, Hope, Embry and/or Sierra actually made compensation promises different from those contained in the Agreement.[9] Even if any one of the agents made additional compensation promises as plaintiff alleges, they are unenforceable as a matter of law because plaintiff fails to establish the threshold requirement: that either Agent Howland, Hope, Embry or Sierra had the requisite "actual authority to bind the [G]overnment in contract." *See City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990).

To establish a valid contract with the United States, a plaintiff must demonstrate: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) that "the Government representative 'whose conduct is relied upon [had] *actual authority* to bind the [Government] in contract.'" *See City of El Centro,* 922 F.2d at 820 (quoting *Juda v. United States,* 6 Cl.Ct. 441, 452 (1984)) (emphasis added). The fourth element is crucial because the Government, unlike private parties, cannot be bound by the apparent authority of its agents. *See Roy v. United States,* 38

Fed.Cl. 184, 187 (1997). Thus, the Court must determine "whether plaintiff has submitted sufficient evidence to establish a disputed issue of fact as to whether the FBI [Special Agents] with whom he allegedly dealt had [actual] authority contractually to obligate the Government." *Roy,* 38 Fed.Cl. at 187; *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). The general rule regarding the authority of government agents to bind the government is set forth in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947): "[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority ... this is so even though ... the agent may have been unaware of the limitations upon his authority." *Federal Crop Insurance,* 332 U.S. at 384, 68 S.Ct. 1. When an agent exceeds his authority, the government can "disavow the [agent's] words and is not bound by an implied contract." *Essen Mall Properties v. United States,* 21 Cl.Ct. 430, 445 (1990) (quoting *New America Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed.Cir. 1989)).

Implied actual authority, like express actual authority, also can bind the Government for the acts of its agents. *See H. Landau & Co.,* 886 F.2d at 324. Authority is "generally implied when such authority is considered to be an integral part of the duties assigned to that Government employee." *Thomas v. INS,* 35 F.3d 1332, 1340 (9th Cir.1994); *H. Landau & Co.,* 886 F.2d at 324 (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982)). As a general rule, DEA Field Agents and FBI Special Agents lack the requisite actual authority—either expressed or implied—to contractually bind the United States to remit rewards to confidential informants/cooperative witnesses. *See Roy,* 38 Fed.Cl. at 188–91; *Khairallah v. U.S.,* 43 Fed.Cl. 57, 63 (1999). This is so because contractual duty is not

---

9. During their respective depositions, each FBI Special Agent vehemently denied making any of the promises plaintiff alleges. Moreover, as detailed above plaintiff allowed Agents Hope and

Howland to equip him with recording devices "voluntarily, and without threats or promises of any kind." Df. App 304.

considered to be an integral part of their duties. *See Roy,* 38 Fed.Cl. at 188–91 (contracting authority is not essential or necessary for FBI Special Agents to effectively perform their tasks of developing, controlling and supervising confidential informants); *Khairallah,* 43 Fed.Cl. at 63 (DEA field agents do not have implied actual authority to enter agreements because the grant of contracting authority is not integral to their duties) (quoting *Cruz–Pagan v. United States,* 35 Fed.Cl. 59, 63 (1996)). In *Roy* the court held that the doctrine of implied actual authority was inapplicable because "contracting authority is not integral to FBI [Special Agents'] informant responsibilities." *See Roy* 38 Fed.Cl. at 190. Accordingly, this Court holds that any promises that Special Agents Howland, Hope, Embry and Sierra might have made to the plaintiff cannot bind the government because the Special Agents lack the requisite authority.

█ Plaintiff attempts to circumvent this principle by maintaining that, at the very least, Special Agent Hope, in his capacity as the "designated representative of the contracting officer," had both express and implied actual authority to bind the government. Plaintiff argues that Hope, acting as the designated representative of the contracting officer, made oral compensation promises that were incidental and integral to his specific assigned duties as the "designated representative," and thus he possessed the requisite authority to bind the Government.

Contrary to what plaintiff claims, FBI Contracting Officer Dietz did not formally delegate the authority to bind the Government to Special Agent Hope. The Agreement merely labeled Special Agent Hope as the "designated representative for the FBI contracting officer." Df. App. 314. Without a formal delegation of contracting authority, such designation is not enough to give a contracting officer's "authorized representative" the requisite authority to bind the Government in contract. *See Essen Mall Properties,* 21 Cl.Ct. at 444–45 (cited in *Aero–Abre, Inc. v. United States,* 39 Fed.Cl. 654, 657 (1997) (contracting officer's technical representative lacked requisite authority to bind

Government in contract)). Delegation of authority "generally relies upon authority specifically designated by a contracting officer." *Miller Elevator Company, Inc. v. United States,* 30 Fed.Cl. 662, 694 (1994). Here, Contracting Officer Dietz did not specifically delegate contracting authority to Special Agent Hope. Thus even if Special Agent Hope, in his capacity as the "designated representative," made oral compensation promises to plaintiff outside of the written Agreement, those promises are unenforceable as a matter of law because of the lack of authority.

Plaintiff alternatively argues that, to the extent that Special Agents Hope, Howland, Embry and Sierra lacked the requisite contracting authority, the FBI ratified the alleged oral compensation promises when: (1) Hope's unnamed "supervisor" was present at the time the purported oral promises were made; and/or (2) Agent Sierra's request for authorization to pay plaintiff his final $2,000 was approved and signed by Special Agent in Charge/Associate Special Agent in Charge Ralph Girardi because Sierra's memorandum noted that a future request for authorization for a post-investigation lump-sum payment to plaintiff was forthcoming.

█ Ratification requires "knowing acquiescence to an unauthorized agreement by a superior who has contracting authority." *Khairallah,* 43 Fed.Cl. at 64; *United States v. Beebe,* 180 U.S. 343, 353, 21 S.Ct. 371, 45 L.Ed. 563 (1901). Thus, in order to prevail, plaintiff must produce evidence that the unnamed supervisor and/or Girardi had the requisite authority and acted in such a manner to manifest "knowing acquiescence" to an agreement by which plaintiff, acting as a cooperative witness, was guaranteed additional compensation beyond the written Agreement. *See Khairallah,* 43 Fed.Cl. at 64.

█ With respect to plaintiff's assertion that Hope's unnamed supervisor ratified the alleged compensation promises, plaintiff fails to establish that this unnamed person had the requisite authority to contractually bind the government. Additionally, an official's mere presence when promises are made does

not establish that he or she possessed actual knowledge that such promises were in fact made. *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed.Cir.1998). Further, ratification must be based on a "demonstrated acceptance" of the oral contract. *See id.* (holding that silence in and of itself is not an assent or acceptance of the oral contract). Thus, because the plaintiff fails to show that the unnamed supervisor: (1) had the requisite authority to contract; (2) had actual knowledge of the compensation promises; and (3) took the affirmative step of "demonstrated acceptance," this Court rejects plaintiff's claim that Hope's unnamed supervisor ratified the alleged oral promises.

Plaintiff's claim that Special Agent–in–Charge/Associate Special Agent–in–Charge Girardi approved, and therefore ratified, Special Agent Sierra's January 25, 1996 request for a post-investigation lump-sum award simply is misplaced. The January 25, 1996 request merely stated:

> This will be the final payment to the source from case funds; however, [our office] is preparing a request for [a] lump sum payment *which will be forwarded via separate cover for approval.*

Df. App. 509 (emphasis added). Although it is true that Girardi signed off on this request, it simply states that a future request for authorization of a post-investigation lump-sum reward payment is forthcoming. It does not contain a simultaneous approval for such payment. Thus, this Court finds that plaintiff's claim of Girardi's ratification is unfounded.

### B. Reformation

As noted earlier, plaintiff seeks to enforce the alleged oral compensation promises through contract reformation. He grounds the reformation claim on mutual mistake and unconscionability or, in the alternative, misrepresentation.

▮ The narrow "purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was a meeting of the minds." *Dairyland Power Cooperative v. United States*, 27 Fed.

Cl. 805, 812–13 (1993) (quoting *Emerald Maintenance, Inc. v. United States*, 925 F.2d 1425, 1429 (Fed.Cir.1991)). Even if the Special Agents made the alleged compensation promises, plaintiff's claim for "mutual" mistake must fail because the plaintiff bore the risk of mistake. *See Dairyland Power Cooperative*, 27 Fed.Cl. at 813 (the plaintiff cannot establish mutual mistake of fact because it bore the risk of mistake under the contract). Plaintiff bears the risk of mistake because "[a]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Insurance Corp.*, 332 U.S. at 384, 68 S.Ct. 1. As stated above, none of the Special Agents who allegedly made the oral compensation promises had the requisite authority to do so. Thus the alleged promises are unenforceable, and there is no mutual mistake.

To the extent that there is a mistake here, it is unilateral. There is no evidence that the FBI intended to pay the plaintiff beyond the terms of the Agreement. It has long been established that, "reformation is not available to correct a unilateral mistake." *Dairyland Power Cooperative*, 27 Fed.Cl. at 812, aff'd, 16 F.3d 1197, 1202–04 (Fed.Cir.1994); *Guard Sec. Police Serv., Inc. v. United States*, No. 90–3914C, 1992 WL 189530, at *2 (Cl.Ct. Mar.30, 1992) ("Relief for a unilateral mistake is granted not for mistakes in judgment, but only for clerical or arithmetic errors or misreading the specifications ... Plaintiff cannot reform the contract based on a mistake in judgment"). Thus, this Court finds that plaintiff's claim for reformation due to mutual mistake must fail.

▮ Similarly, plaintiff's claim for reformation due to misrepresentation also must fail. This Court has held that a claimant cannot rely on alleged oral misrepresentations of a Government official to reform the terms of a clearly written contract. *See Guard Sec. Police Serv., Inc. v. United States*, No. 90–3914C, 1992 WL 189530, at *3. Moreover, plaintiff's claim for contractual misrepresentation "fails for the fundamental reason that [he] ha[s] not demonstrated that any of the misrepresentations complained of

were made by [an authorized Government official] as a matter of law." *Nematollahi v. United States,* 38 Fed.Cl. 224, 232 (1997).

### C. Preclusive Effects of the Integration Clause

 Even if the Special Agents did have the requisite authority to contractually bind the Government, plaintiff's claims are barred by the Agreement's Integration Clause. The Integration Clause provides:

> This document constitutes the full and complete agreement between HUMLEN and the FBI. *Modifications to this agreement will have no force and effect unless and until such modifications are reduced to writing and signed by all parties thereto.*

Df. App. 313 (emphasis added). It is undisputed that the alleged compensation promises were not contained in the parties' written Agreement, nor the subject of a written modification. Therefore, plaintiff's claims to enforce additional oral compensation terms directly collides with the plain language of the Agreement. The compensation terms under the Agreement provided that the FBI: (1) would remit monthly payments of up to $2,000 to plaintiff throughout the relevant time period; (2) would pay for or reimburse plaintiff for the reasonable expenses incurred during the Steelwind Investigation; (3) could formally exercise its discretion as to whether to furnish plaintiff with a post-investigation lump-sum reward payment; and (4) would offer plaintiff sponsorship into the United States Marshal's Federal Witness Protection Program. Any additional compensation promises would have to be in writing in order to be enforceable under the Agreement.

Plaintiff attempts to render the integration clause inapplicable by labeling his claim for additional payment as an equitable reformation rather than a modification. This Court finds such characterization to be a distinction without a difference. A claim for additional compensation based on alleged oral promises made by Special Agents Hope, Howland, Embry and Sierra is barred by the express terms of the contract. Under the Agreement, those promises must have been re-

duced to writing and signed by the parties in order to be enforceable.

 Further, any attempt to claim that an implied-in-fact contract exists must fail. The Federal Circuit has repeatedly stated, and this Court has recently reiterated, that "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Moore v. United States,* 48 Fed.Cl. 394, 401 (2000) (quoting *Trauma Serv. Group, Ltd. v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997)). In the instant case, the express Agreement clearly covers the subject matter in question, i.e., plaintiff's compensation, and explicitly indicates how any modifications are to be made. Accordingly, plaintiff's implied-in-fact contract theory must be rejected. *See Moore,* 48 Fed.Cl. at 400–02.

### D. FBI Breach of the Express Terms of the Agreement

 Plaintiff claims that the FBI breached the express terms of the agreement by failing to have the Attorney General decide whether or not a lump-sum cash award should be paid to the plaintiff. The provision in question provides:

> The *FBI may,* at *its sole option and choice,* elect to furnish HUMLEN with an award of money upon the completion of the investigation. The amount of any award is at the *complete and total discretion of the FBI and/or the Attorney General* of the United States and, as stated in 28 U.S.C. § 524 [ (1994) ], any award for information or assistance leading to a civil or criminal forfeiture is at the complete and full discretion of the Attorney General and shall not exceed the lesser of $250,000 or one-fourth of the amount realized by the United States from the property forfeited. Factors which may be considered *by the FBI in determining any award* may include, but not be limited to, the following ....

Df. App. 311–12 (emphasis added). Nothing in the cited provision requires the Attorney General to personally and independently decide whether plaintiff was entitled to a post-investigation lump-sum reward payment. This Court does not interpret, as plaintiff would, the portion "as stated in 28 U.S.C.

§ 524 [ (1994) ], any award for information or assistance leading to a civil or criminal forfeiture is at the complete and full discretion of the Attorney General and shall not exceed the lesser of $250,000" to mean that the Attorney General shall make the final decision. Rather, it means that when the decision is left to the discretion of the Attorney General, the governing statute is 28 U.S.C. § 524—under which the Attorney General has complete discretion to determine the amount of any award. *See* 28 U.S.C. § 524(c)(1)(B)(C), (2). The decision of whether or not to give plaintiff a post-investigation lump-sum award was completely and properly within the discretion of the FBI, and therefore there was no breach of the express written terms of the Agreement.

 Further, plaintiff's claim that the FBI was unreasonable in electing not to give plaintiff a post-investigation lump-sum reward is outside the purview of this Court. Given the FBI's absolute discretion to remit such an award, the matter is nonjusticiable. *See Murphy v. United States,* 993 F.2d 871, 872–73 (Fed.Cir.1993) (matters left to the unlimited discretion of the military are not subject to judicial review); *Fluellen v. United States,* 225 F.3d 1298, 1304 (Fed.Cir.2000). This Court cannot second guess the agency's decision. Instead the Court's role is limited to determining whether the particular agency followed established tests and standards. *See id.* Here, there are no such tests and standards from which the Court can measure the FBI's action, and thus judicial review of the matter is inappropriate.

#### E. Equitable Relief

 Plaintiff maintains that it would be "patently unfair and unconscionable" to allow the government to avoid its agents' alleged compensation promises because his reliance on these promises has permanently endangered his life. Therefore, plaintiff argues that this is an appropriate case for equitable estoppel, or other appropriate equitable remedy. The doctrine of equitable estoppel only applies in this case if: (1) the Government knew the facts; (2) the Government intended that its conduct be acted on or acted so that the plaintiff had a right to believe that it was so intended; (3) the plaintiff was ignorant of the true facts; (4) the plaintiff relied on the Government's conduct to his injury; and (5) "the conduct or representations relied upon must be made by [G]overnment officers *acting within the scope of their authority.*" *See Essen Mall Properties,* 21 Cl.Ct. at 446 (quoting *City of Alexandria v. United States,* 3 Cl.Ct. 667, 678 (1983), *rev'd on other grounds,* 737 F.2d 1022 (Fed.Cir.1984)) (citing *Jackson v. United States,* 216 Ct.Cl. 25, 573 F.2d 1189, 1197 (1978)) (emphasis added). The last element only applies in an equitable estoppel action against the Government because the Government "may not be estopped on the same terms as any other litigant." *See Doe v. United States,* 48 Fed.Cl. 495, 505 (2000) (quoting *Heckler v. Cmty. Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). As discussed above, none of the Special Agents who allegedly made the compensation promises had the requisite authority to do so, and therefore, plaintiff's claim for equitable estoppel must fail.

#### II. Breach of Contract Claim Against the U.S. Customs Service

As mentioned above, plaintiff served as a confidential informant to the USCS in the Montoya investigation before he became a cooperative witness in the FBI Steelwind Investigation. In addition to his claims for money damages against the FBI, he asserts that the USCS made similar compensation promises. Specifically, plaintiff claims that USCS Special Agent O'Shaughnessy orally promised him: (1) $500 per kilogram of cocaine seized by the USCS during any investigation in which he participated; and (2) a guaranteed lump-sum award payment in an amount equal to 25% of the value of all money and property seized and forfeited by the USCS in any investigation in which he participated.

 There is some factual dispute as to whether the USCS arrested any suspects or seized and/or forfeited any money or property. The Government maintains that plaintiff's claim is unwarranted because, unlike the FBI, the DEA and the participating state

law enforcement agencies, the USCS did not seize or forfeit any money or property. Regardless of whether the USCS did in fact take any suspects into custody or seize or forfeit any money or property, the alleged oral promises made by O'Shaughnessy are unenforceable as a matter of law.[10]

USCS Special Agents, like FBI Special Agents, lack the requisite authority, either expressed actual or implied actual, to contractually bind the United States. *See Garza v. United States*, 34 Fed.Cl. 1, 17–21 (1995); *Howard v. United States*, 31 Fed.Cl. 297, 312–14 (1994). The same analysis used above in the case of FBI Special Agents' authority applies to USCS Customs Agents. Accordingly, this Court concludes that any oral compensation promises allegedly made by USCS Agent O'Shaughnessy to plaintiff are unenforceable as a matter of law.

▆▆ Additionally, as with the claim against the FBI, plaintiff claims that Special Agent O'Shaughnessy's oral promises were ratified by an "unnamed supervisor." Plaintiff has failed to establish that this unnamed supervisor had the requisite contracting authority to ratify an unauthorized oral compensation promise. Therefore the ratification claim is denied. Similarly, plaintiff's claim that the Department of the Treasury ("DOT") ratified the unauthorized compensation promises, must also fail. Plaintiff maintains that the DOT ratified the alleged compensation promises when it formally denied his claim for payment. The ratification apparently occurred in the agency's September 26, 1996 letter:

> In your letter, you state that [USCS] Special Agent Michael O'Shaughnessy promised to pay Mr. Humlen 25% of any amounts recovered through the efforts, cooperation and assistance of Mr. Humlen. According to [Special] Agent O'Shaughnessy, Mr. Humlen was not promised any such awards, but was instead advised, as required by 19 C.F.R. § 161.14 [ (1996) ], *that he might be entitled to compensation for the information provided.* Payments which [the USCS] made to Mr. Humlen were for specific information he provided,

and did not relate to amounts "recovered" by [the USCS].

Df. App. 567 (emphasis added). Plaintiff relies on the notion that he "might be entitled to compensation…" to establish the ratification. This statement in no way commits the agency to remitting a definite post-investigation lump-sum payment to plaintiff. As such, this Court rejects plaintiff's claim for ratification.

Plaintiff further contends that because Special Agent O'Shaughnessy advised him, pursuant to 19 C.F.R. § 161.14, that he "might be entitled to compensation," the United States has wrongly denied his claim for compensation under 19 U.S.C. § 1619 (1996) and implementing regulations, 19 C.F.R. § 116.11 *et seq.* (1996), on the grounds that he failed to provide evidence that the USCS seized and forfeited any currency or property. Although there is a dispute as to whether or not the USCS actually did seize or forfeit any money or property, the plaintiff's claim must fail. Even if the USCS seized money, a USCS confidential informant like plaintiff cannot rely on § 1619 in furtherance of his claim for a reward payment. *See Emmens v. United States*, 44 Fed.Cl. 524, 526–28 (1999). In dismissing the confidential informant's complaint, the *Emmens* court explained:

> Section 1619's money-mandating reward provisions are explicitly limited by its statutory language to cases in which the informant aids in the prosecution of [C]ustoms laws violations. The prosecution that plaintiff claims to have aided, however, was for violation of drug enforcement statutes, specifically 21 U.S.C. §§ 841, 846, 952, 960, and 963 [ (1996) ]—*not the [C]ustoms laws.* Furthermore, the forfeitures for which plaintiff seeks recovery were effected pursuant to 21 U.S.C. § 853, also a drug enforcement statute.

*Emmens*, 44 Fed.Cl. at 526 (emphasis added); *Nicolas v. United States*, 35 Fed.Cl. 387, 391–92 (1996); *Sarlund v. United States*, 39 Fed.Cl. 803, 805–07 (1998). Thus, under *Emmens*, plaintiff's reliance upon the USCS re-

---

10. Again, as with the FBI Special Agents, the Court need not decide the factual question of whether USCS Special Agent O'Shaughnessy made compensation promises to the plaintiff.

ward statute is unfounded.[11] The Court finds that plaintiff's claims for money damages against the USCS must fail.

### CONCLUSION

For the reasons stated, this Court finds that there are no genuine issues of material fact in dispute, and the Government is entitled to judgment as a matter of law. Defendant's motion for summary judgment is granted. The Clerk shall enter judgment for the defendant. No Costs.

---

**11.** The Court notes that *Doe v. United States,* 47 Fed.Cl. 367 (2000) recently reached the opposite conclusion and allowed a confidential informant to rely on the USCS reward statutes to establish a claim. That result, however, is inapposite to this case. In awarding plaintiff a post-investigation $5,000 lump-sum reward payment, the USCS has effectively mooted plaintiff's claim. *See Doe v. United States,* 100 F.3d 1576, 1583 (Fed.Cir.1996) (holding that the Government is vested with "broad discretion" in determining amount of reward payments); 19 C.F.R. § 161.16(a) (1999) (range of reward payments is from $100 to $250,000).