**JGB ENTERPRISES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–680C.**

United States Court of Federal Claims.

Dec. 22, 2004.

n. 6; *Maier,* 754 F.2d at 983–84.

der SP0750–00–M–4191 ("PO 4191"); and (4) the Government improperly offset monies owed by Capital City Pipes ("Capital City") against the payment due JGB on contract 2508. As a result, the Court directs the entry of judgment for plaintiff in the amount of $101,223.99.

### FINDINGS OF FACT

United States Court of Federal Claims Rule ("RCFC") 52(a) governs "actions tried upon the facts," and provides that findings of fact may be "based on oral or documentary evidence ... and due regard shall be given to the opportunity of the trial court to judge of [sic] the credibility of the witness." RCFC 52(a). Based on the record, including oral and documentary evidence, the Court makes the following findings of fact:

### I. DSCC Contract Administration

The Defense Supply Center Columbus ("DSCC") is a part of the Defense Logistics Agency. DSCC procures a wide range of supplies for the United States military, including hose assemblies for military vehicles. DSCC utilizes pre-award and post-award contracting officers ("CO"). In general, DSCC assigns a pre-award CO to handle a procurement until the contract is awarded; after award, the pre-award CO has nothing to do with the contract except for the decision whether to exercise any contract options. After award, the post-award CO is responsible for administration of the contract.

In 1999–2000, Carolyn Mathews was a post-award CO in the Land Division of DSCC. Post-award COs in the Land Division were assigned based on the state in which the prime contractor was located. Mathews was responsible for prime contractors in the state of Florida, including Capital City, which was located in Tallahassee. In early March 2000, Phyllis Moore replaced Mathews as the Land Division's post-award CO for prime contractors in Florida, including Capital City.

COs did not necessarily know they were assigned to a particular contract unless "a problem appear[ed] on [their] desk." Transcript of Trial, JGB Enterprises, Inc. v. Unit-

Joseph P. Hornyack, Sonnenschein Nath & Rosenthal LLP, Washington, D.C., for plaintiff.

Ada E. Bosque, Trial Attorney, Franklin E. White, Jr., Assistant Director, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

### OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court after a trial held on May 10 and 11, 2004 in Columbus, Ohio. Defendant filed a Post–Trial Memorandum of Contentions of Fact and Law on June 22, 2004. Plaintiff filed its Post–Trial Proposed Findings of Fact and Conclusions of Law on June 25, 2004. Closing argument was held in Washington, D.C. on August 9, 2004. For the reasons set forth below, the Court holds that: (1) the Court has jurisdiction over the third-party beneficiary claim of JGB Enterprises, Inc. ("JGB") pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000) but not the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601–613 (2000); (2) JGB was a third-party beneficiary of contract SP0750–99–C–2508 ("2508"); (3) JGB was not a third-party beneficiary of Purchase Or-

ed States, No. 01–680C at 117 (Fed.Cl. May 10–11, 2004) ("Tr."). All correspondence relating to a particular contract was placed in an official contract file. Since the contract files were centrally located within DSCC, any CO was able to obtain and review the official contract file.

## II. Office of Small and Disadvantaged Business Utilization

The Small Business Act established an Office of Small and Disadvantaged Business Utilization ("OSDBU") within each federal agency. 15 U.S.C. § 644(k). Among other things, the Act grants the OSDBU the power to:

> assist small business concerns to obtain payments, ... or information regarding payment due to such concerns from an agency or a contractor ... or any other protection for contractors or subcontractors (including suppliers) that is included in the Federal Acquisition Regulation or any individual agency supplement to such Government-wide regulation.

15 U.S.C. § 644(k)(6). The Federal Acquisition Regulation ("FAR") and Defense Department FAR Supplement ("DFARS") include provisions that essentially mirror the above-quoted statute. See 48 C.F.R. § 19.201(d)(6); 48 C.F.R. § 219.201(e)(vi).

The functions and duties assigned to each OSDBU are carried out by Small Business Specialists, appointed in accordance with agency regulations. 48 C.F.R. § 19.201(e). Within DoD, Small Business Specialists are appointed by contract administration activities. 48 C.F.R. § 219.201(e). Michael Taylor was a Small Business Specialist with DSCC's OSDBU. He was assigned to the Land Division. Generally, Taylor's job was to identify DSCC contracting opportunities for small disadvantaged business or "8(a)" contractors and to assist both pre-award and post-award contracting officers with any problems relating to 8(a) contracts. Taylor was often the focal point for exchange of information among contracting officers dealing with a particular 8(a) contractor. The Court found Mr. Taylor to be a credible witness.

## III. The Central Contractor Registration and SAMMS

The Central Contractor Registration system ("CCR") is a database used by the Government to retain contractor information. 48 C.F.R. § 252.204–7004(a). When awarded a contract, the contractor must register in the CCR database by providing all required information. *Id.* at 252.204–7004(a)(4), (b)(1). When a contractor registers in the CCR database, it must provide, among other things, information relating to payment by electronic funds transfer ("EFT"). 48 C.F.R. § 252.232–7009(c). Contractors register in the CCR database via the Internet. Because a personal identification number is required, only the contractor itself can change its CCR information. Even the CO cannot change the data entered by the contractor.

DSCC contracting officers and Defense Financing and Accounting Service ("DFAS") personnel have access to a database known as Standard Automated Materiel Management System ("SAMMS"). One screen of SAMMS identifies the current remittance address of any contract. This screen states that the contractor's "CAGE [code] has been flagged for electronic funds only. To override electronic payment, enter and select Address 1." Joint Trial Exhibit ("JTX") 30A–C. This means that by punching certain keys, an authorized person can override the contractor's EFT instruction. While the COs do not have the ability to override the EFT instruction directly, a DFAS disbursing officer may do so at the CO's direction.

The remittance address identified in SAMMS is required to match the remittance address in the hard copy of the contract. Likewise, the EFT information the contractor puts into the CCR is required to match the remittance address shown in SAMMS and the hard copy of the contract. If the CO discovers that the remittance addresses do not match, he or she should contact the contractor to find out why. If a contractor states that it does not want the CCR to match the remittance address, that may suggest that the contractor is trying to "pull a fast one." Tr. at 342.

## IV. JGB Enterprises and Capital City Pipes

JGB is in the business of manufacturing hose assemblies and other products for military and commercial uses. JGB is located in Liverpool, New York, a suburb of Syracuse. Capital City was a firm located in Tallahassee, Florida that was certified by the U.S. Small Business Administration ("SBA") under the 8(a) program.

Beginning in 1998, DSCC set aside its requirements for hose assemblies, previously supplied by JGB, for Capital City under the 8(a) program. According to DSCC CO Phyllis Moore, Capital City, as an 8(a) contractor, "needed a lot of help, prodding and so forth. They would ask for a lot of help . . . from the small business office on how to handle the day-to-day business." Tr. at 302–03.

During 1999, Capital City received several sole-source contracts and purchase orders from DSCC to supply hose assemblies manufactured and delivered directly to the Government by JGB. In chronological order, by date of award, DSCC awarded Capital City the following contracts: Contract Nos. SP0750–99–C–2505 ("2505"), SP0750–99–E307 ("E307"), SP0750–99–C–2506 ("2506"), SP0750–99–C–2508 ("2508"), SP0750–00–M–4191 ("4191"), and Purchase Order SP0750–M–4333 ("4333"). Capital City was also awarded a contract in February 2000 by the U.S. Navy for hose assemblies to be manufactured and delivered by JGB. Under each of these contracts, JGB purchased the materials, fabricated the hose assemblies, made presentations to the Government Quality Assurance Representative located in Syracuse, shipped products directly to the Government, and sent the required forms directly to the Government.

## V. Contract 2508

DSCC awarded contract 2508 to Capital City on July 28, 1999. It called for 639 hose assemblies to be delivered by October 13, 1999. JTX 3. As originally awarded, the "Remit Payment To" clause in Section B provided:

Remit Payment to:
CAPITAL CITY PIPES INC.

P.O. BOX 12368
TALLAHASSEE, FL 32317

Clause E01, "Inspection at Origin," identified the following as the place where all hose assemblies were required to be inspected and packaged prior to delivery:

Cage Code: 61125
J.G.B. ENTERPRISES
115 METROPOLITAN DR
LIVERPOOL, N.Y. 13088

## VI. JGB's Complaints to DSCC Regarding Non–Payment by Capital City

By late October 1999, Capital City was indebted to JGB for over $362,000. JGB became concerned that Capital City would not satisfy this debt because JGB had received several checks from Capital City that were returned for insufficient funds. On October 27, 1999, JGB's President, Jay Bernhardt, and Vice President of Operations, Robert Zywicki, called CO Carolyn Mathews seeking her help with the Capital City non-payment matter. They informed Ms. Mathews that JGB would withhold future shipments pending resolution of the matter. Bernhardt and Zywicki also informed Mathews that they had been working with DSCC Small Business Specialist, Michael Taylor, to try to resolve the matter. Mathews told Bernhardt and Zywicki that she did not want to deal with JGB because JGB was not the prime contractor; she told them to talk to Capital City. It was Mathews's understanding that she was not permitted to speak to a subcontractor.

CO Mathews contacted the cognizant administrative contracting officer ("ACO") in Clearwater, Florida, Lynn Rahtes, and discussed with her Capital City's failure to pay JGB. Mathews told Rahtes that the internal Government customer had requested acceleration of deliveries under contract 2508—meaning that the troops in the field urgently needed the supplies. Rahtes told Mathews that Capital City's outstanding contracts, then 2506 and 2508, "may go delinquent if JGB stops shipping material if [it] can't get paid." Tr. at 127.

Also on October 27, 1999, Zywicki wrote to DSCC concerning Capital City's failure to

pay JGB for past deliveries and JGB's position regarding future deliveries. This letter was addressed to Taylor and copied to several Government officials, including CO Mathews, DSCC Legal Counsel Anne Turner, and the ACOs in both Syracuse, New York and Clearwater, Florida. In the October 27, 1999 letter, JGB stated:

> It is my understanding that the Government has fully paid Capital City Pipes under contract number SP0750–99–C–2505 with the last payment occurring September 28, 1999. On October 1, 1999 Capital City Pipes sent us check number 7960 in the amount of $55,510 (copy attached) which was returned for insufficient funds.... If this check bounces again the total indebtedness under contract number [2505] will be $353,342.50. Our company has been lied to by all responsible people at Capital City Pipes including the President. Based on this, we have stopped production under [contract 2506] pending resolution of this matter.
>
> ... Please contact me immediately with a proposed resolution.

JTX 6. JGB's October 27, 1999 letter was in the official contract file produced by defendant during discovery in this matter.

The next day, Mathews advised the DSCC "item manager" via e-mail that contract 2508 was "on hold pending legal action being initiated by Anne D. Turner," which referred to a pending change order relating to the packaging of the assemblies. Mathews added that "JGB may refrain from shipping any additional materials since Capital City Pipes has failed to pay for materials on [the 2505 contract]." JTX 7. By that, Mathews meant that once the packaging change order was resolved, the Government still had a problem in that JGB might not deliver because of the non-payment by Capital City.

## VII. CO Mathews's Demand for Corrective Action

By letter dated November 2, 1999, CO Mathews advised Capital City as follows:

> It has come to my attention that you have failed to compensate your subcontractor, JGB Enterprises, Inc. for work performed under the referenced contracts....

> Your failure to properly compensate your subcontractor could potentially jeopardize the scheduled deliveries under contracts SP0750–99–C–2506 and SP0750–99–C–2508 and deprive the Government of the goods for which it contracted.
>
> In accordance with FAR 9.406–2, I view your failure to compensate your subcontractor so serious as to affect your present responsibility as a Government contractor. Accordingly, within 10 days of receipt of this letter, please advise me of what actions your firm has taken to remedy this problem or state why I should not recommend Capital City's debarment.

JTX 8. The dollar amounts in Mathews's November 2, 1999 letter are identical to those in JGB's October 27, 1999 letter. The November 2, 1999 letter indicates that her office code at that time was "LECC." In her correspondence, she advised "In Reply Refer To DSCC–LECC." The November 2, 1999 letter was a follow-up action to the conversations Mathews had with JGB and ACO Lynn Rahtes on October 27, 1999. In response to the letter, Mathews expected Capital City to present her with a corrective action plan. Mathews viewed her November 2, 1999 letter as extraordinary in view of the fact that she had never before sent a letter to a contractor that threatened debarment.

## VIII. The Escrow Agreement Between Capital City and JGB

In the period between JGB's October 27, 1999 letter and November 10, 1999, Taylor and Zywicki discussed the Capital City non-payment problem. Zywicki, whom the Court found to be a credible witness, again told Taylor that JGB was going to withhold shipments to the Government under the Capital City contracts until the matter was resolved. Taylor believed that JGB had a "legitimate gripe." Tr. at 186. Taylor suggested a solution to the problem whereby Capital City and JGB would enter into an escrow agreement appointing an escrow agent to receive funds directly from the Government and then distribute the funds to JGB and Capital City. Prior to this suggestion by Taylor, JGB had never used an escrow account in connection with a prime contractor payment problem.

Taylor contacted Capital City's President, Lee Gilliam, and discussed the possibility of using an escrow agreement between JGB and Capital City to provide JGB the assurance it was looking for. This solution would require the authorization of both the prime and subcontractor to release funds. It was an approach that Taylor had become aware of years earlier when he was a contract administrator at DSCC. This approach would require the Government to change the remittance address in the prime contracts to the escrow agent agreed upon by the prime and subcontractor.

JGB's President Bernhardt called CO Mathews again on November 8, 1999, and advised her that he had spoken with Capital City's president and "want[ed] all future payments to be remitted to a trustee or something like that." JTX 10.

On November 10, 1999, Capital City and JGB entered into an Escrow Agreement whereby JGB's local attorney, Michael Kawa, was appointed as an escrow agent for receipt of payments for all DSCC–Capital City contracts under which JGB was the subcontractor. In the Escrow Agreement, Capital City agreed to execute the necessary documents to ensure that all payments under the remaining Capital City prime contracts would go directly to Mr. Kawa, who would distribute the appropriate amounts to JGB.

## IX. Capital City's Initial Requests To Change the Remittance Address on Contract 2508 and PO 4191

By letter dated November 10, 1999 to CO Mathews, Capital City requested a modification of the remittance address on contract 2508:

> Capital City Pipes apologize [sic] for any inconvenience this may have caused the Government of the United States, as well as you and JGB Enterprises, Inc. We are aware of the seriousness of this situation.
>
> \* \* \* \* \* \*
>
> We have spoken with JGB Enterprises and are resolving the misunderstanding. We are requesting a modification on payment remittance address on the two pending purchase orders in process now.

We request payment go to: Michael Kawa, Esq.
300 Crown Bldg.
304 S. Franklin Street
Syracuse, N.Y. 13202

JTX 11 (boldface type in original). Copies of this letter were sent to JGB, Michael Taylor, the ACO in Clearwater, and the SBA office in Jacksonville. JGB received a copy of the letter.

CO Mathews understood that Michael Kawa was the individual that JGB President Bernhardt referred to in their November 8, 1999 telephone conversation in which Bernhardt stated that he wanted payments remitted to "a trustee or something like that." Tr. at 144. Mathews understood that the request to make Kawa the payee was Capital City's attempt to comply with her November 2, 1999 request for a corrective action plan. After receiving Capital City's November 10, 1999 letter, Mathews did not ask Capital City for further corrective action.

Michael Taylor knew Kawa was an escrow agent that would enable JGB to control the release of funds. He believed this approach would provide the assurance JGB was looking for and would cause JGB to start shipping product again.

As of November 10, 1999, Capital City had an offer pending under DSCC solicitation number SPO750–99–Q–5778 for 306 hose assemblies. This solicitation later became Purchase Order 4191. In accordance with the Escrow Agreement, Capital City sent an additional letter on November 10, 1999 to the pre-award CO under that solicitation, Lu Ann Bocsy, requesting a change in the payment remittance address to:

Michael Kawa, Esq.
300 Crown Bldg.
304 S. Franklin Street
Syracuse, N.Y. 13202

JTX 58 (boldface type in original). The letter further instructed, "If you have any further questions please call me at . . . ." JGB received this letter as well, but was not listed as a recipient on the letter. On November 15, 1999, Capital City again wrote to the pre-award CO and repeated its request that the payment address be changed to Michael Kawa, Esq. in Syracuse, New York. JTX 41. This correspondence also stated that "if you have any questions please call me." *Id.* Neither request from Capital City to CO Bocsy

mentioned JGB by name nor referred generically to a vendor or subcontractor. Additionally, neither letter gave any explanation for the requested change. JTX 41, 58. Pre-award CO Bocsy, whom the Court found to be a credible witness, made no effort to find out why Capital City wanted the remittance address on its offer changed from Capital City to Kawa. Although she spoke with Capital City's Thelma Williams on November 16, the day after she received the second request to change the remittance clause, she did not ask Williams why Capital City had requested the change. Nor did CO Bocsy ask the industrial specialist, Small Business Specialist, or post-award CO about Capital City's request to change the remittance address.

## X. Award of PO 4191

On November 24, 1999, DSCC issued PO 4191 in the amount of $45,275.76 for 306 hose assemblies. It was signed by pre-award CO Bocsy. Bocsy had complied with Capital City's requests of November 10 and 15, 1999, and typed Kawa's name and address into the remittance address on PO 4191. At that time, CO Bocsy assumed that payment under PO 4191 would be made by check. Like contract 2508, PO 4191's Inspection at Origin and Packaging clauses identified JGB Enterprises in Liverpool, New York and Defense Contract Management Command ("DCMC") Syracuse as the office administering the contract. It was apparent on the face of PO 4191 that JGB would be manufacturing the hose assemblies.

The first page of PO 4191 identified the office code "LECC" as the post-award CO; it did not identify any post-award CO by name. Under DSCC's procedures, if the contractor needed to communicate with the post-award CO for PO 4191, it could simply address correspondence to the LECC code and the correspondence would be circulated to the correct CO, *i.e.*, the CO responsible for prime contractors in Florida. Thus, the same CO would receive all correspondence related to Capital City. Although CO Mathews was still post-award CO for all contractors in Florida, including Capital City, when PO 4191 was awarded, Mathews did not know whether she was the post award CO for PO 4191. Pre-

award CO Bocsy did not know who was assigned as post-award CO on PO 4191.

Although JGB had never spoken to pre-award CO Bocsy, Zywicki assumed that Bocsy was communicating with post-award CO Mathews and Michael Taylor concerning the communications between and among JGB, Capital City and DSCC in late October and early November 1999. The record reflects that Ms. Bocsy did not speak to Mr. Taylor or CO Mathews regarding Capital City and JGB. JGB received a copy of PO 4191 on or about the date it was issued. Upon seeing PO 4191 in late 1999, Zywicki believed the Government would pay Kawa by check. As of November 1999, JGB was also a prime contractor to the Government and would routinely receive payments by both EFT and paper check. Thus, JGB had no concerns about the Government's ability to pay the escrow agent, Michael Kawa, by check.

A few days before awarding PO 4191, pre-award CO Bocsy queried the CCR and verified that Capital City was registered in the CCR database. She did not attempt to determine whether the EFT data that Capital City had entered into the CCR database matched the remittance address in PO 4191 because she did not have access to that information. According to Ms. Bocsy, the DFAS disbursing officer would have been able to verify that the CCR data matched the remittance address in the contract. CO Bocsy did not request such verification because ensuring that payment was made in accordance with the contract was not her responsibility as the pre-award CO.

## XI. Delivery and Payment Under PO 4191

JGB shipped the items under PO 4191 directly to the Defense Department Depot on February 8, 2000. JGB would not have shipped the hose assemblies under PO 4191 if the Government had not placed Kawa's name on the remittance address. Phyllis Moore, the cognizant CO at the time, did not query the CCR to determine whether Capital City's payment instructions matched PO 4191, although she acknowledged that it would have been possible to do so.

The Government did not send the PO 4191 payment to Kawa. Instead, on April 24, 2000,

without informing JGB, it paid by EFT to Capital City's bank. Capital City did not pay for the hose assemblies under PO 4191.

## XII. Further Efforts to Change the Remittance Address on Contract 2508

By December 1999, DSCC had not changed the remittance address on contract 2508, as requested by Capital City. CO Mathews discussed Capital City's request with Tony Griffin, Michael Taylor's superior in the OSDBU. On December 22, 1999, JGB sent a fax directly to CO Mathews attaching a copy of Capital City's November 10, 1999 letter and repeating the request that the remittance address be changed to Michael Kawa. JGB asked Mathews to inform JGB when the requested change was made. On December 23, 1999, CO Mathews sent a letter to Capital City denying its request to change the remittance address but suggesting that Capital City might "request through DCMC Clearwater an Assignment of Claims to a financial institution." JTX 14.

On January 31, 2000, JGB sent an additional letter to Capital City requesting that the remittance address on the 2508 contract be changed to Mr. Kawa. JTX 17. JGB sent copies of the request to CO Mathews and DCMC Clearwater. At this point, Mathews was still in the process of negotiating the packaging change order on contract 2508. The negotiations involved an increase in JGB's costs for changed packaging. On March 22, 2000, Mathews issued a contract modification relating to the packaging change.

## XIII. Change of Post–Award Contracting Officers on Contract 2508 and PO 4191

The March 22, 2000 modification was Mathews's last official act as post-award CO on contract 2508. Due to an organizational shift within the Land Division of DSCC, Mathews ceased being the CO for contractors in the state of Florida. She was initially replaced by Ann Martin, who was in the process of retiring and was herself promptly replaced by Phyllis Moore. The record is unclear regarding the exact date of reassignment from Mathews to Moore. Mathews did not advise Capital City or JGB of her reassignment because it was not the policy of DSCC to do so.

Mathews's office was in close proximity to Moore's. When Mathews was reassigned, she handed Moore the 2508 contract file. Like Mathews, CO Moore's office code was LECC. At the time of reassignment, the problem for which Mathews had demanded corrective action on November 2, 1999—Capital City's failure to pay its vendor, JGB—was unresolved in Mathews's mind. Mathews and Moore never discussed any of the Capital City contracts.

CO Moore could not recall whether she reviewed the contract file at the time she succeeded Mathews as post-award CO. Moore testified that she had never read CO Mathews's November 2, 1999 letter, JGB's October 27, 1999 letter, CO Mathews's October 27, 1999 Conversation Record, or Capital City's November 10, 1999 letter, all of which were in the contract file at the time Ms. Moore was the post-award CO. According to Ms. Moore, she either did not review the file or, if she did, simply "overlooked" these documents. Tr. at 285–89. While the Court believed some of Ms. Moore's testimony, her claims of ignorance regarding JGB's allegations of non-payment and the attempts to remedy the situation were not credible.

Upon assuming the post-award responsibilities for Capital City's contracts, CO Moore sent an "ALERT" message to Capital City's ACO at DCMC Clearwater with an attached list of all contracts and purchase orders awarded to Capital City, including PO 4191 and contract 2508. Moore requested that the ACO "maintain surveillance" of these contracts/orders. Moore's March 24, 2000 ALERT message to the ACO concluded as follows:

> This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable. The material on these contracts are [sic] urgently needed.

JTX 23. Moore's ALERT message identified the contract 2508 deliveries as being 161 days delayed. At her deposition Moore testified that she understood the reason for this

delay was JGB's allegation that it had never been paid for past deliveries. At trial, Moore denied that she knew the reason for the delay.

### XIV. Continued Attempts to Change the Remittance Address on Contract 2508

In accordance with the suggestion of CO Mathews in her letter of December 23, 1999, Capital City requested that the ACO in Clearwater approve an assignment of claims under contract 2508. Capital City made clear to the ACO that JGB and Capital City had signed an agreement to use Kawa as a "go-between." In early April 2000, the ACO denied the request to execute an assignment.

When Zywicki learned that DCMC Clearwater had denied the requested assignment, he contacted Taylor and told him that JGB had more than $200,000 of product ready to ship and needed his help resolving the question of how JGB could be assured payment. Zywicki reiterated to Thelma Williams of Capital City that JGB was not willing to ship product unless the remittance address was changed.

Taylor considered another approach to provide a subcontractor with assurance of payment: direct payment to a bank account where the subcontractor's signature was required to release the funds. Taylor testified that he discussed this approach with CO Moore in April 2000. While CO Moore denied having these discussions with Taylor, Moore testified that she relied on Taylor to interact with Capital City regarding problems in delivering the supplies under its DSCC contracts.

On April 12, 2000, Thelma Williams of Capital City called CO Moore seeking her help with a "vendor-payment issue." Tr. at 291–92. Moore's handwritten memo of her conversation with Williams, stated:

> Ms. Williams asked for my help. She said there have been numerous conversations pertaining to assignment of claims. I repeatedly told everyone involved that all we want to do is to have monies go to the vendor. Material is complete, this is not a loan.

> After careful review of the previous actions, I suggested if this is not an assignment, their company & the vendor's company must set up an account where monies will be directly sent or set aside for the vendor. If they can agree, there's no need for Government intervention. An assignment is a transfer of the contractor's right to be paid by the Government, to another contractor to secure a loan. In this case I do not believe we are talking about transferring your right to be paid.

> How you pay your vendors, should be your decision.

> However, I see a problem in your remittance address if its not to a bank. DFAS does not want to make paper checks.

> If an agreement cannot be made, please explain to the vendor the order will be terminated and that there is no guarantee that there would be an award to them. They will lose out all the way around. Since this material is urgently needed, I will entertain on a one time basis for this award, changing the remittance address to a bank or whatever is agreeable.

JTX 26.

Williams told Moore that the material required by the contract could not be shipped until the vendor payment issue was resolved. Tr. at 295–96. As Moore's notes reflect, Williams and Moore discussed a solution to the problem whereby the parties would "set up an account where monies could be sent or set aside for the vendor" and the remittance address on the contract would be changed to this account. Moore also confirmed during this conversation that the hose assemblies were urgently needed by the troops.

Later in the day on April 12, 2000, Williams called JGB and said that she had been in contact with the contracting officer to address the problem. Williams asked for the remittance address of JGB's bank so it could be inserted into contract 2508. Zywicki faxed Williams the bank account information for JGB's account at Chase Manhattan Bank in Syracuse, New York.

By letter dated April 13, 2000, Capital City requested that CO Moore modify the remittance address on contract 2508 to the Chase

Manhattan bank account in Syracuse, New York. Capital City's letter provided the EFT data for the Chase Manhattan account, and was conspicuously copied to "JGB Enterprises, Inc./Robert Zywicki." JTX 28. CO Moore testified that she understood the Chase Manhattan account identified in Capital City's letter to be the type of account she had discussed with Thelma Williams in their April 12, 2000 conversation. Tr. at 312–13, 373–75.

## XV. The Modification of the Remittance Clause: P00002

Later on April 13, 2000, CO Moore issued modification P00002 amending contract 2508's remittance address to the account at Chase Manhattan Bank in Syracuse. CO Moore knew the purpose of changing the remittance address: to remedy the subcontractor's concern about non-payment and assure that it would deliver the hose assemblies. The modification included the routing and account numbers. Moore noted on the modification that "[d]ue to the urgency of this item, this modification is issued to change the remittance address on a one time basis." JTX 27 at 3. CO Moore testified that she believed the Chase Manhattan Bank account was Capital City's account, but conceded that she understood it was "an account where monies will be directly sent or set aside for the vendor." JTX 26. JGB received a copy of P00002 on the day it was issued. Upon seeing the change in the remittance address, JGB shipped the bulk of the contract 2508 hose assemblies the next day.

## XVI. An Amendment to P00002: A00001

On May 10, 2000, the DFAS disbursing officer, Phil Kover, contacted the ACO for Capital City. Although P00002 included the EFT data for Chase Manhattan Bank, Kover advised the ACO that DFAS wanted to pay for the contract 2508 shipments by check. To do so, according to Kover, Capital City's name needed to be inserted into the remittance address on the contract. Kover and the ACO sought CO Moore's permission to issue a modification inserting Capital City's name into the remittance address so that DFAS could pay by check. On May 11, 2000, CO Moore gave this authorization.

On May 16, 2000, without informing JGB, the ACO issued an amendment to modification P00002. The amendment provided as follows:

a. The remittance address added by P00002, dtd. 00 APR 13, is amended as follows:

Capital City Pipes

c/o Chase Manhattan Bank

P.O. Box 4911

Syracuse, N.Y. 13202

b. The following is retained for information only—Authorized Official: Marla P. Share 315–446–1418, Routing # 021309434, Account # 600–285235.

JTX 33.

If JGB had seen the language in A00001 prior to April 14, 2000, it would not have authorized shipment of the hose assemblies under contract 2508.

## XVII. Payment and Offset Under Contract 2508

On May 18, 2000, instead of wiring money to JGB's Chase Manhattan Bank account, DFAS sent a check to Capital City Pipes, Inc. in the amount of $57,365.79 c/o Chase Manhattan Bank, Syracuse. On June 14, 2000, DFAS sent an additional check to Chase Manhattan Bank, Syracuse for deliveries under contract 2508.

On May 26, 2000, the bank officer at Chase Manhattan Bank in Syracuse informed Zywicki that she had received a check from the Government under contract 2508. Accompanying the May 18, 2000 check was a copy of a letter from DFAS to Capital City dated February 4, 2000. The February 4 letter stated that Capital City was indebted to the Government in the amount of $115,141.41 on an unrelated contract, and if the Government was not paid within 30 days, it would offset this amount against any unpaid invoice available. Prior to seeing the DFAS letter in May of 2000, JGB had no knowledge that Capital City was indebted to the United States or that an offset was contemplated. Had JGB known these facts prior to April 14,

2000, JGB would not have shipped the contract 2508 hose assemblies to DSCC.

## XVIII. JGB's Damages

JGB seeks damages in the amount of $43,987.50 and $101,223.99 for unpaid invoices (exclusive of interest) on PO 4191 and contract 2508, respectively. Pl.'s Post–Trial Proposed Findings of Fact and Conclusions of Law at 25 (citing Tr. at 98). Zywicki testified that JGB has incurred over $250,000 in attorneys' fees and consulting fees, as well as hundreds of thousands of dollars in internal time, pursuing these unpaid invoices.

## DISCUSSION

### I. Jurisdiction

Plaintiff asserted jurisdiction pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601–613 (2000) and the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000). Compl. ¶ 3. Plaintiff's complaint requests that "the Court enter judgment against Defendant in the amount of $160,417.17 plus interest . . . ." Compl. at 6.

 The Tucker Act confers jurisdiction on the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). Generally, subcontractors cannot sue the Government directly due to a lack of privity with the United States. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed.Cir. 1983). It is settled law in this circuit, however, that an intended third-party beneficiary of a government contract may sue under the Tucker Act. *Flexfab, LLC v. United States*, 62 Fed.Cl. 139, 144–45 (2004); *Erikson v. United States*, 12 Cl.Ct. 754, 757 (1987); *Hebah v. United States*, 192 Ct.Cl. 785, 792, 428 F.2d 1334, 1339 (1970); *Maneely v. United States*, 68 Ct.Cl. 623, 629, 1929 WL 2450 (1929).

 Because plaintiff appears to be seeking pre-judgment interest on its claim, the Court must also address the more complicated question whether a third-party beneficiary can bring a claim under the CDA. The basic rule is that interest is not payable on claims or on judgments against the United States in the absence of express provision for payment, in contract or statute. JOHN M. STEADMAN ET AL., LITIGATION WITH THE FEDERAL GOVERNMENT § 6.120, at 159 (3d ed.1994) (citing *United States v. Thayer–West Point Hotel*, 329 U.S. 585, 107 Ct.Cl. 714, 67 S.Ct. 398, 91 L.Ed. 521 (1947); *United States v. Sherman*, 98 U.S. 565, 25 L.Ed. 235 (1878)). The Tucker Act, however, provides for jurisdiction in the Court of Federal Claims over "any claims by or against, or dispute with a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 . . . on which a decision of the contracting officer has been issued under [41 U.S.C. § 605 (2000)]." 28 U.S.C. § 1491(a)(2) (2000). Under the CDA, "interest on amounts due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to section 6(a) [41 U.S.C. § 605(a)] from the contractor until payment thereof." 41 U.S.C. § 611.

 Cases in this circuit involving claims of third-party beneficiaries to a government contract assume jurisdiction without explicitly discussing the statutory basis therefor. *See D & H Distrib. Co. v. United States*, 102 F.3d 542 (Fed.Cir.1997); *Norwest Bank Arizona, N.A. v. United States*, 37 Fed.Cl. 605 (1997). The district courts have simply assumed that they had CDA jurisdiction over third-party beneficiary claims, though they recognized that there was "no case directly addressing the precise issue of the standing of third-party beneficiaries under the CDA." *Hodgdon v. United States*, 919 F.Supp. 37, 39 (D.Me.1996); *J.W. Bowman Co. v. United States*, 2001 AMC 1626, 1634 (S.D.Cal.2001) ("assuming, but not deciding, that plaintiffs can sue the United States under the CDA as third-party beneficiaries . . . ."). The Boards of Contract Appeals have interpreted the Federal Circuit's decision in *D & H Distributing* as conferring CDA jurisdiction over claims by third-party beneficiaries, despite the fact that the basis for jurisdiction in *D & H Distributing* was the Tucker Act, not the CDA. *Foremost Solutions, Inc.*, IBCA Nos.

4520 and 4521, 04–2 BCA ¶ 32,739 (2004); *Appeal of FloorPro, Inc.*, ASBCA No. 54143, 04–1 BCA ¶ 32,571 (2004).

When interpreting a statute, the Court "give[s] the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Statutory interpretation begins with the language of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). The Court, however, "may consult dictionaries, *see Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1371 (Fed.Cir. 2003), and legislative history, *see Neptune Mut. Ass'n Ltd. of Bermuda v. United States*, 862 F.2d 1546, 1549 (Fed.Cir.1988), if necessary to construe the statute." *NTP, Inc. v. Research in Motion, Ltd.*, 392 F.3d 1336, 1368 (Fed.Cir.2004). The CDA provides a contractor with the right to sue the Government. Accordingly, it is a waiver of sovereign immunity, and thus, must be strictly construed in favor of the Government. *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615, 619–20, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992); *Cosmic Constr. Co. v. United States*, 697 F.2d 1389, 1390 (Fed.Cir. 1982).

The CDA provides that only a "contractor" may appeal the decision of a contracting officer. 41 U.S.C. § 609(a)(1) ("a contractor may bring an action directly on the claim"). Furthermore, section 605 provides for "contractor" claims. 41 U.S.C. § 605(a). The term "contractor" is defined in the CDA as being "a party to a government contract other than the Government." 41 U.S.C. § 601(4). A third-party beneficiary is "[an entity that], *though not a party to a contract*, stands to benefit from the contract's performance." BLACK'S LAW DICTIONARY 149 (7th ed.1999) (emphasis added). Because a third-party beneficiary is not a party to a contract, it is not a "contractor" as defined in section 601 of the CDA, and JGB cannot assert a claim under the CDA. Thus, even if JGB prevails on the merits of its claims, this Court does not have authority to award pre-

judgment interest on the amount found to be due and owing to JGB.

## II. JGB Was a Third–Party Beneficiary of Contract 2508 But Not PO 4191

### A. *The Legal Standard for Third–Party Beneficiary*

■ Third-party beneficiaries of a contract to which the United States is a party may assert a claim against the United States in accordance with the law governing third-party claims. *Roedler v. N. States Power Co.*, 255 F.3d 1347, 1351 (Fed.Cir.2001). Applying the federal common law that governs the contracts of the United States, and taking note that a contract with the United States is to be construed and the rights and duties of the parties determined by application of the same principles of law as if the contract were between private individuals, the Court applies the principles of third-party beneficiary law as developed in the common law and explained by precedent. *Id.* at 1351–52 (citations omitted).

■ The test to determine third-party beneficiary status is whether the contract reflects the express or implied intention of the contracting parties to benefit the third-party. *Montana v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997). "One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Id.* at 1273–74 (citing RESTATEMENT (SECOND) OF CONTRACTS § 302(1)(b) cmt. d); *Frank & Breslow, LLP v. United States*, 43 Fed.Cl. 65, 67 (1999) ("The test for a third party beneficiary relationship ... is one of reasonable reliance"). Despite the Government's many arguments to the contrary, this is an objective test. *See Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971); *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 524 F.2d 680, 684 (1975).

"The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby." *Montana*, 124 F.3d at 1273. "The court carefully

must distinguish between incidental and indirect beneficiaries and direct beneficiaries, only the latter of which qualifies for third-party beneficiary status." *Guardsman Elevator Co. v. United States,* 50 Fed.Cl. 577, 582 (2001) (citing *Schuerman v. United States,* 30 Fed.Cl. 420, 433 (1994)); *see also German Alliance Insurance Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912). Whether a plaintiff is a third-party beneficiary is a mixed question of law and fact. *Guardsman,* 50 Fed.Cl. at 582 (citing *Glass v. United States,* 258 F.3d 1349, 1353 (Fed.Cir.2001)). "When the intent to benefit the third party is not expressly stated in the contract, evidence thereof may be adduced." *Roedler,* 255 F.3d at 1352.

 In the case of a contract in which the promisee (Capital City) provides goods or services to the promisor (the Government), it has long been settled that a clause providing for the promisor to pay the proceeds of the contract to a third party (JGB) is enforceable by the third party where the payment is intended to satisfy a present or future liability of the promisee to the third party. *D & H Distrib.,* 102 F.3d at 546–47. The third-party beneficiary in that situation has traditionally been referred to as a "creditor beneficiary" and has been accorded full rights to sue under the original contract. *Id.* at 547 (citing 4 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 787 (1951); 3 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 10.2 (1990); 2 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 361–64, 381 (Walter H.E. Jaeger ed., 3d ed.1959)). The same principle would apply if the payment clause provided that a portion of the proceeds were to be paid to the promisee and a portion to the third party. *Id.* Where a contract's remittance clause was changed to give a subcontractor control over contract payments from the Government, the Federal Circuit and the Court of Federal Claims have held that the subcontractors qualified as third-party beneficiaries with the right to recover directly from the Government. *See D & H Distrib.,* 102 F.3d at 547–48; *Riviera Finance of Texas, Inc. v. United States,* 58 Fed.Cl. 528, 532–33 (2003); *Norwest,* 37 Fed. Cl. at 610.

### B. *Only Government Officials With Authority Can Bind the Government*

 It is well recognized that "anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). A government employee possesses express authority to bind the government when the Constitution, a statute, or a regulation unambiguously grants him such authority. *Flexfab,* 62 Fed.Cl. at 148 (citing *Starflight Boats v. United States,* 48 Fed.Cl. 592, 598 (2001)). A government employee possesses implied authority to bind the government when such authority is an integral part of the duties assigned to him. *Humlen v. United States,* 49 Fed.Cl. 497, 503 (2001). Contracting authority is integral to a government employee's duties when the government employee could not perform his or her assigned tasks without such authority and the relevant agency regulation does not grant such authority to other agency employees. *Flexfab,* 62 Fed.Cl. at 148 (citing *Roy v. United States,* 38 Fed.Cl. 184, 189–90 (1997)).

As a threshold matter, COs Mathews, Moore, and Bocsy, "acting within the scope of their authority [were] empowered to execute contract modifications on behalf of the Government." 48 C.F.R. § 43.102(a) (1999). Furthermore, at all times relevant to this action, contracting officers were permitted to address subcontractor assertions of non-payment. *See* 48 C.F.R. § 32.112–1(a) (1999). Specifically, "upon the assertion by a subcontractor or supplier of a Federal contractor that the subcontractor or supplier has not been paid in accordance with the terms of the subcontract, purchase order, or other agreement with the prime contractor, the contracting officer may determine ... whether the contractor has made ... payments to the subcontractor or supplier in compliance with the terms of the subcontract ...." 48 C.F.R. § 32.112–1(a)(2).

### C. *Contract 2508*

 As discussed above in detail, JGB and Capital City repeatedly spoke with and

sent letters to CO Mathews regarding JGB's allegation that Capital City was not making payments in accordance with the subcontract. JGB consistently informed DSCC that it would not ship the hose assemblies under contract 2508 until it was assured of receiving payment. The first attempt to assure payment was Capital City's November 10, 1999 request to change the remittance address on the contract to Michael Kawa, Esq. JTX 11. That letter was sent to, among others, CO Mathews and JGB. The letter was in direct response to CO Mathews's letter dated November 2, 1999, in which Ms. Mathews demanded that Capital City address JGB's allegations of non-payment. On December 23, 1999, CO Mathews sent a letter to Capital City denying its request to change the remittance address. JTX 14. Instead, CO Mathews suggested that Capital City execute an assignment. *Id.* On January 31, 2000, JGB sent a letter to Capital City again requesting that it change the remittance address on the contract. JTX 17. CO Mathews was copied on that letter. *Id.* Before the situation could be resolved, Ms. Moore replaced Ms. Mathews as contracting officer for Capital City.

In early April, 2000, the ACO denied Capital City's requested assignment. On April 12, 2000, Capital City's Thelma Williams telephoned CO Moore to discuss the "vendor payment issue." Tr. at 291–92. It appears that JGB may not have been mentioned by name in that conversation, but all CO Moore had to do was look at the contract file, which she had access to as the contracting officer, and she would have immediately understood that the vendor being discussed in the April 12, 2000 telephone call was JGB. Additionally, regardless of the specific identity of the subcontractor, Moore was aware that Capital City was looking for ways to assure its subcontractor of payment so the subcontractor would ship the goods. JTX 26. CO Moore and Ms. Williams discussed the possibility of Capital City and "the vendor" obtaining a bank account where monies could be "directly sent or set aside for the vendor." JTX 26. The *next day,* Capital City sent a letter to CO Moore requesting that the remittance address be changed to Chase Manhattan Bank, Syracuse. JTX 28. JGB was copied

on that request. *Id.* Moore conceded that she understood the Chase Manhattan account identified in Capital City's April 13 letter to be the type of account she discussed with Thelma Williams the day before. Tr. at 312–13, 373–75. That same day, April 13, 2000, CO Moore issued modification P00002, changing the remittance address pursuant to Capital City's request. JTX 27.

Plaintiff relies on the Federal Circuit's decision in *D & H Distributing,* 102 F.3d 542. There, the prime contractor, CIM, attempted to execute a subcontract with D & H to supply hard disks. D & H, however, was reluctant to extend credit to CIM. *Id.* at 544. Following negotiations between CIM and D & H, CIM wrote to the National Security Agency ("NSA") asking that both CIM and D & H be designated as payees on all payments made under the contract. *Id.* In accordance with CIM's request, the CO issued a contract modification that made CIM and D & H joint payees for the proceeds of the contract. *Id.* Thereafter, D & H delivered the hard disks to the Government. *Id.* Contrary to the terms of the modification, however, NSA issued a check for the full contract price in the name of CIM, and did not designate D & H as a joint payee. *D & H Distrib.,* 102 F.3d at 544–45. CIM negotiated the check and subsequently made only partial payment of its obligation to D & H. *Id.* at 545. D & H filed suit against the United States in the Court of Federal Claims seeking to recover the unpaid portion of its invoice to CIM. *Id.* The Federal Circuit held that D & H was a third-party beneficiary with respect to the payment clause of the modified contract because:

> The entire purpose of the joint payment clause was to provide protection for D & H by giving it the right to control the disbursement of the contract proceeds and thereby to ensure that its invoice to CIM would be paid. The rights conferred on D & H were designed to effectuate the payments of CIM's debt to D & H, which would arise upon CIM's execution of the contract. This case therefore presents a particularly clear instance in which the third party beneficiary's interests, specifically protected by the contract, would be

impaired if the beneficiary were not accorded the right to obtain relief against the promisor in the event of a breach.... Accordingly, we conclude that D & H is entitled to enforce the payment provision of the contract, and that the breach of that provision by the government gave D & H a cause of action against the government for damages.

102 F.3d at 547.

Although JGB was not listed by name as joint payee, CO Moore understood that the Chase Manhattan Bank account was an account "where monies will be directly sent or set aside for the vendor." JTX 26. As in *D & H Distributing*, the entire purpose of modifying the remittance clause was to provide protection for the supplier/subcontractor by giving it the right to control the disbursement of the contract proceeds, and thereby ensure that its invoice to the prime contractor would be paid. 102 F.3d at 547. Based on the Federal Circuit's reasoning in *D & H Distributing*, JGB is a third-party beneficiary with respect to the remittance clause of contract 2508.

Though not cited by the parties, the recent decision in *Flexfab* warrants discussion. *Flexfab*, 62 Fed.Cl. 139. That case involved a similar non-payment issue with the same prime contractor, Capital City, but a different subcontractor. *Id.* In *Flexfab*, Judge Block granted summary judgment to the government because the "pre-award and post-award contracting officers, the only individuals involved with authority to contract on behalf of the government, could not have intended to benefit Flexfab because they had no knowledge of the purpose of the remittance address in both the Contract and the Modification." *Id.* at 148–49. Unlike in *Flexfab*, CO Moore knew the purpose of changing the remittance address.

The Government makes much of the fact that CO Moore and CO Mathews did not consider it their responsibility to "help" JGB, nor were they interested in the general welfare of JGB. This argument is unavailing because the subjective intention of the government is irrelevant. *Firestone Tire & Rubber*, 195 Ct.Cl. at 30, 444 F.2d at 551; *ITT Arctic Servs.*, 207 Ct.Cl. at 752, 524 F.2d

at 684. The only reasonable interpretation of the record mandates a finding that the Government intended to modify the contract to assure JGB of payment so that JGB would ship the hose assemblies that were "urgently" needed. Given the sequence of events relating to contract 2508, JGB was "reasonable in relying on [P00002] as manifesting an intention to confer a right on [it]." *Montana v. United States*, 124 F.3d at 1273.

### D. *PO 4191*

■ Unlike contract 2508 where COs Mathews and Moore were provided with a plethora of information regarding JGB's assertions of non-payment, CO Bocsy, the pre-award CO for PO 4191, was never informed of the situation between JGB and Capital City. While Michael Taylor may have fully understood the purpose of modifying the remittance clause of PO 4191, that information was not conveyed to CO Bocsy. Michael Taylor does not have contracting authority, and accordingly cannot bind the Government. *See* 48 C.F.R. § 43.102(a) (1999) (only contracting officers are empowered to execute contract modifications on behalf of the Government).

Capital City sent two letters to CO Bocsy requesting that the remittance clause of its offer be changed to Michael Kawa. JTX 58, 41. The requested modifications did not mention JGB or any vendor or subcontractor. *Id.* JGB was not copied on that correspondence. *Id.* Capital City did not explain why it wanted to change the remittance address. *Id.* Additionally, JGB concedes that it did not speak with CO Bocsy. *Supra* at 326. Rather, it assumed that Taylor and Mathews would communicate with Bocsy. *Id.* Neither Taylor nor Mathews represented to JGB that they had spoken with Bocsy regarding Capital City and JGB—and in fact, they did not speak with her. JGB's mistaken assumptions regarding what CO Bocsy knew cannot bind the Government. *See Firestone Tire & Rubber*, 195 Ct.Cl. at 30, 444 F.2d at 551; *ITT Arctic Servs.*, 207 Ct.Cl. at 752, 524 F.2d at 684. JGB could have protected its rights by taking the same steps it took regarding contract 2508—informing the CO about the

non-payment issue and the purpose of modifying the remittance clause.

CO Bocsy testified that she did not know that Michael Kawa was affiliated in any way with JGB. Based on the limited information provided to CO Bocsy, there was no reason for her to know the motivation for the request or Mr. Kawa's relationship to JGB. Like the COs in *Flexfab*, CO Bocsy, "the only individual[ ] involved with authority to contract on behalf of the government, could not have intended to benefit [JGB] because [she] had no knowledge of the purpose of [changing] the remittance address." *Flexfab*, 62 Fed.Cl. at 148–49.

Neither JGB nor Capital City explained the vendor payment problem to CO Bocsy. They failed to reference JGB in any way, and they failed to explain to Bocsy the relationship between Kawa and JGB. Accordingly, JGB was not "reasonable in relying on the [remittance clause in PO 4191] as manifesting an intention to confer a right on [it]." *Montana*, 124 F.3d at 1273. JGB, therefore, is not a third-party beneficiary of PO 4191. JGB is not in privity with the Government concerning that contract, and cannot maintain a suit for damages against the Government resulting from the payment to Capital City rather than to Kawa on PO 4191. *See Johnson Controls*, 713 F.2d at 1551.

**III. The Government Improperly Offset Monies that Capital City Owed on Other Contracts Against Payments Due JGB in Accordance With Contract 2508.**

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913)). "The Government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" *United States v. Munsey Trust Co.*, 332 U.S. 234, 239, 108 Ct.Cl.

765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). "The 'established right of set-off' permits the government 'to set-off against progress payments … a federal claim on another contract (with the same contractor) which is believed in good faith, but mistakenly, to be valid.'" *Centron Corp. v. United States*, 218 Ct.Cl. 1, 6–7, 585 F.2d 982, 985 (1978) (quoting *William Green Constr. Co. v. United States*, 201 Ct.Cl. 616, 625, 477 F.2d 930, 936 (1973)).

Even where offset rights can be validly asserted, however, offset has not been allowed in circumstances where the party owing the debt is not the beneficial owner of the offsetting credit. *United States v. York*, 909 F.Supp. 4, 9 (D.D.C.1995) (citing *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960) (holding that a contracting party may not offset damages caused by a breach at the expense of the third-party beneficiary to the contract); *Capuano v. United States*, 955 F.2d 1427, 1430 (11th Cir.1992) ("It goes without saying that neither party may offset moneys in its hands belonging to some other party.")). The Court in *York* concluded that "even if the government had established its common law right to effect administrative offset in satisfaction of a judgment, such a right would not obtain to the funds at issue here, which belong to a third-party beneficiary." *York*, 909 F.Supp. at 9. Because JGB was a third-party beneficiary of the right to payment under contract 2508, JGB was the beneficial owner of the payments, and the Government could not offset debts owed by Capital City under a separate contract.

Defendant contends that any common law offset right would be a "contract defense" to a claim for payments under contract 2508. That is incorrect. The Government does not have a "defense" to a claim for payments under contract 2508. Rather, it has a claim against Capital City to recoup overpayments under a separate contract, and it collected that claim by exercising an offset on payments due under contract 2508. It is hornbook law that "claims and defenses of the promisor [the Government] against the promisee [Capital City] arising out of separate transactions do not affect the right of

the beneficiary [JGB] except in accordance with the terms of the contract." RESTATEMENT (SECOND) OF CONTRACTS § 309 (1981) cmt. c. Accordingly, the Government's offset under contract 2508 was improper.

## CONCLUSION

For the reasons discussed above, the Court holds that: (1) the Court has jurisdiction over JGB's claim pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) but not the CDA, 41 U.S.C. §§ 601–613; (2) JGB was a third-party beneficiary of contract 2508; (3) JGB was not a third-party beneficiary of PO 4191; and (4) the Government improperly offset monies owed by Capital City against the payment due JGB on contract 2508. The clerk is directed to enter judgment for plaintiff in the amount of $101,223.99.

IT IS SO ORDERED.